CROWDER *et al.* v. SEARCY *et al.*, *Appellants*.

### DIVISION TWO.

1.  **Pleading:** ANSWER: SEVERAL DEFENSES.  A defendant can plead in his answer as many defenses as he may have, whether they be legal or equitable, or both ; the only limitation being that the facts constituting them must be consistent.   (R. S. 1889, sec. 2050.)

2.  **Deed, Delivery of.**  The delivery of a deed is essential to the transfer of title.

3.  ——: ——: VOLUNTARY SETTLEMENTS.  The law presumes much more strongly in favor of the delivery of deeds in the case of voluntary settlements, especially when made to infants, than it does in ordinary cases of bargains.

4.  —— : ——.  The facts in this case examined and *held* to show a delivery of a deed by the grantor to his grandchildren.

5.  **Equity:** TWO DEEDS: ONE TRANSACTION.  Where a second deed is given in correction of a prior one, equity will construe their making and delivery as one transaction.

*Appeal from Daviess Circuit Court.*—HON. C. H. S. GOODMAN, Judge.

REVERSED.

*Hicklin & Yates* and *G. A. Chapman* for appellants.

(1)  The court did not err in striking out part of defendants' answer.  The first deed was a valid one. (2)  The evidence shows a valid execution and delivery of the second deed.  1 Devlin on Deeds, sec. 262 ; 2 Greenleaf's Ev., sec. 297 ; *Huey v. Huey*, 65 Mo. 689. (3)  The lower court erred in disregarding the verdict of the jury and their answer to the interrogatories. *Jones v. Swayse*, 42 N. J. Law, 279.

*Rush, Alexander & Richardson* for respondents.

(1) The. court did not err in striking out the part of the answer indicated. R. S. 1879, sec. 3529; Bliss Code Pleading, sec. 423. (2) Appellants also assign as error that the court erred in rendering judgment avoiding the deed because of its non-delivery. One of the grounds upon which plaintiffs seek to avoid the deed is non-delivery, and if the evidence fails to show that it was delivered the decree is right, for delivery is essential to the complete execution of a deed, and if not delivered it is of no more effect than if not signed. *Hammerslaugh v. Cheatham*, 84 Mo. 13; *Huey v. Huey*, 65 Mo. 689; 3 Wash. on Real Prop. [3 Ed.] p. 254, secs. 20–20 *a*. (3) The execution and acknowledgment of a deed, although made in pursuance of a prior agreement, do not constitute a delivery. So long as it remains undelivered it is inoperative as a conveyance. *Turner v. Carpenter*, 83 Mo. 333; *Fountain v. Saving Inst.*, 57 Mo. 552. What is necessary to constitute a delivery of a deed? *Turner v. Carpenter*, 83 Mo., *supra*.

GANTT, P. J.—The plaintiffs, Pocahontas and Cassandra Crowder and Martha Moore, are the daughters of Francis Searcy, deceased. The defendant, Smith Searcy, is his only son, and Ada, Martha and Effie are the daughters of Smith Searcy, and granddaughters of Francis Searcy.

Francis Searcy died March 10, 1883. Prior to his death, Francis Searcy was the owner of the following real estate in Daviess county, Missouri, to-wit: All that part of southwest quarter of southeast quarter of section six (6) contained inside the fence around said house and lot on said forty acres, containing eight acres more or less; also twenty acres off of the east side of the west half of the southeast quarter of section seven (7), also two acres, more or less, out of the northwest corner of the southwest quarter of the northwest

quarter of section eight ( 8 ); also four acres, more or less, off of the southwest corner of section 8, all in township number 59, range 29.

On the eighth day of March, 1883, a general warranty deed from Francis Searcy to Ada, Martha and Effie Searcy, conveying the above-described land, purporting to have been executed and acknowledged on March 5, 1883, was filed for record in the office of the recorder of deeds of Daviess county, and was recorded in book 44, page 282. This is a suit in equity to set aside said deed, on the ground that Francis Searcy was, at the date of its alleged execution, of unsound mind and enfeebled intellect, and charging that he did not execute said deed, nor authorize it, and that it was delivered without his knowledge or consent to the recorder for record.

The petition was filed November 25, 1885, and the answer November 15, 1886.

" The defendants, Ada F. Searcy, Martha E. Searcy and Effie M. Searcy, for their answer to plaintiffs' petition, say that Francis Searcy, mentioned in plaintiffs' petition, died on the —— day of March, 1883, leaving surviving him his following-named children and heirs at law, viz.: Plaintiffs, Pocahontas Crowder, Cassandra Crowder and Martha Moore, and defendant, Smith P. Searcy. The defendants, Ada F. Searcy, Martha E. Searcy and Effie M. Searcy, are the children of the above named Smith P. Searcy and the granddaughters of said Francis Searcy, deceased.

[ "That some time prior to his death, to-wit, on the ——day of——1883, the said Francis Searcy, by warranty deed, conveyed certain lands of which he was the owner to said Cassandra Crowder ; at the same time or about the same time he, by warranty deed, conveyed certain other of his lands to said Martha Moore, and, about the same time or at a prior time, the said Francis Searcy conveyed by sufficient deed certain portions of his remaining lands to said Smith P. Searcy, and also gave his daughter, Cassandra Crowder, a large amount of personal

property, the aforesaid lands and personal property being bestowed as gifts by said Francis Searcy upon his said children.

"That the said Francis Searcy regarding with much favor and affection his three grandchildren, the defendants, Ada F. Searcy, Martha E. Searcy and Effie M. Searcy, on the —— day of —— 1883, at the time he was deeding the above-mentioned lands to his children, Cassandra Crowder, Martha Moore and Smith P. Searcy, also by warranty deed in legal form conveyed a quantity of his remaining lands to his said granddaughters, the defendants, Ada F. Searcy, Martha E. Searcy and Effie M. Searcy, which last-mentioned deed included the lands described in plaintiffs' petition. This last-mentioned deed was duly executed by said Francis Searcy and was delivered by him to his said grandchildren, Ada F., Martha E. and Effie M. Searcy, the defendants herein. By this last-mentioned deed the said Francis Searcy, being of sound mind, intended to convey, and did convey, the lands described in plaintiffs' petition to said Ada F., Martha E. and Effie M. Searcy, his said granddaughters.

"That before this last-mentioned deed was recorded it was ascertained by said Francis Searcy that said deed by mistake of the conveyancer, who wrote said deed, included and conveyed twenty acres of other lands, besides that described in plaintiffs' petition, which twenty acres said Francis Searcy did not intend to convey to his said granddaughters, but intended to convey only the land as described in plaintiffs' petition. In the making of this deed this mistake was not noticed by said Francis Searcy, owing to the lengthy and detailed description in said deed of said lands.]

"That on the fifth day of March, 1883, the said Francis Searcy, for the purpose of correcting the mistake referred to above, and intending to correct said mistake, executed and delivered to defendants, Ada F., Martha E. and Effie M. Searcy, a warranty deed for the

land described in plaintiffs' petition, and for no other lands, which deed is recorded in book 44, at page 282, of the deed records of Daviess county, Missouri, and is the deed referred to in plaintiffs' petition; that at the time the said last-mentioned deed was executed the said Francis Searcy was of sound mind and of sufficient capacity to execute said deed and knew full well what disposition he was making of his said lands.

"That in executing and delivering said last-mentioned deed to his grandchildren, Ada F., Martha E. and Effie M. Searcy, the said Francis Searcy intended to convey and did convey the lands mentioned in said deed and described in plaintiffs' petition to said Ada F., Martha E. and Effie M. Searcy.

"Defendants, further answering, deny each and every allegation in plaintiffs' petition, except such as are herein admitted, and pray that they may be discharged with their costs and also for other and proper relief."

On the motion of the plaintiffs, the circuit court struck out all that portion of defendants' answer relating to the execution of a prior deed and included in brackets in this report. To this action of the court defendants duly saved their exception.

The cause was tried at the February term, 1887, of Daviess circuit court. A jury was impaneled to determine certain special issues, to-wit: "Did Francis Searcy, the grantor in the deed mentioned in plaintiffs' petition, have sufficient mental capacity at the time he signed said deed to comprehend what disposition he was making of the land mentioned in said deed?" And, "Was there a delivery of said deed?"

Thomas B. Crowder, a brother of Hugh and John F. Crowder, the plaintiffs, testified: He was well acquainted with Francis Searcy. He died March 10, 1883. He was eighty-nine years old. He lived with his son-in-law, Hugh Crowder. Witness was present when deed in question was executed, also some pension papers.

Remembers Esq. R. N. Moore, the justice, presenting the deed and pension papers to Francis Searcy for him to sign. Moore said to the old man, who was lying on his bed with a broken leg, "Uncle Frank, I have got those papers for you to sign." "Don't think Searcy made any reply, but he might." Witness held the book and the deed and pension papers were laid on the book for Searcy to sign. Moore raised his hand and held it for him to sign. Moore made the mark. Searcy had been palsied many years. "I do not think he was competent to transact business. Long before this transaction, Francis Searcy made a deed to the defendants to the lands in question, save there was a mistake in describing thirty acres. By mistake, he left out of the first deed thirty acres of the homestead and included in it thirty acres he had conveyed to his daughter, Martha Moore." Witness knew nothing of the execution of the first deed, until on one occasion, being at the residence of Francis Searcy, "The old gentleman called to his daughter, Cassandra Crowder, and told her to get some deeds out of his trunk, saying he wanted me to have them recorded. His daughter brought the three deeds. One to his daughter Pocahontas, one to Cassandra, and one to defendants, his granddaughters. He handed her the three deeds, and directed me to record them. Called for his pocket book, and gave me $4.50, $1.50 to record each deed. I had the Cassandra *deed and Adams deed recorded, but did not have the deed to defendants recorded*, for the reason that I discovered a mistake in the description of thirty acres. Esq. Moore had prepared and taken the acknowledgment to this deed. The lands in suit were all the lands he had left. He had owned seven hundred acres, and had conveyed it to his children prior to this time. He gave as a reason for deeding to his granddaughters, that his son was dissipated. When I discovered the mistake, I took the deed back and showed it to Francis Searcy and convinced him of his mistake. He did not then endeavor

to correct it.    He never took back the deed from me.
He did not tell me to correct or have it corrected.    After
his leg was broken I sent for Esq. Moore to correct
the deed.    I had attended to the old man's business for
many years."

Cross-examination : "The land in the second deed,
and in this suit, was intended by him to be conveyed
in first deed.    He left some $4,000 or $5,000 in per-
sonal estate at his death.    I had Moore come and
correct the deed because I thought it was my duty to
do so.    I explained to Esq. R. N. Moore the mistake
and had him prepare the deed.    Francis Searcy knew
Moore was preparing the deed, and before he came
back into his room called out, 'Are those papers
ready ?'    Nobody said anything about his incapacity
at the time to make the deed.    I sent the pension
papers he signed *at* the *time* and drew the money
on them.    I was not aware a man had to be of sound
mind to sign pension papers.

"I took the deed and had it recorded.    I paid for
recording it with the money Francis Searcy had given
me to record the first deed.    Francis Searcy's will was
made after this deed was made.    I was appointed
executor.    I took the will to the probate court.    Heard
the witnesses testifying, he was of sound mind and did
not contradict them.    At the time I got the second deed
( the one sought to be set aside ) I did not object to the
manner in which it was made.    Francis Searcy never
countermanded his instructions to me to record the first
deed."

Martha Moore, the daughter, testified to the cir-
cumstances attending the execution of the deed ; that
Searcy was not conscious of what he was doing ;
admitted that she did not know all that passed.

Hugh Crowder testified that Francis Searcy was not
capable of doing business when the deed was made.

On cross-examination, he says : "After the deed
and pension papers were signed, Francis Searcy roused

up and said to my wife (his daughter), 'Get some money and pay Esq. Moore ; you know where my money is.' My wife got the money and paid Esq. Moore. This was just after signing and before Moore left the room. Francis Searcy told me some time before he made the first deed that he was going to deed this land to the defendants, his granddaughters. When he told me this, his mind was sound. I was present when Esq. Moore drew first deed. Searcy told Moore he wanted to deed his remaining lands to his three granddaughters, the defendants. Moore stayed all night and drew the deed. That is the deed the mistake was made in."

Bruce Crowder, a grandson, testified his grandfather was in a stupor when they brought the deed for him to sign. On cross-examination, remembered the old man asking for the money to pay the justice. Remembered that Moore only charged fifty cents. N. J. Rogers was not present when deed was made, but was there after the old man's leg was broken and he was in a stupor.

Wright Taylor testified the old gentleman was suffering intensely, but he saw nothing to make him think his mind was unsound.

The following testimony was introduced for the defense :

Dr. J. N. Hapman, testified : "I was living in two and one-half miles of Francis Searcy when he died. I have been practicing medicine since 1876 ; was called to see him when his leg was broken. I knew him well. When I called to see him first after his leg was broken, I observed nothing unusual in the action of his mind. He gave me a perfectly rational and intelligent answer to every question I asked him. I gave him a little morphine to quiet his pain. I saw him twice a day until he died. I saw nothing at any visit I made to indicate that he was of unsound mind. His mind never seemed to wander in the least. He always recognized

me and those around him.  I was not present when the deed in question was signed, but I visited him on the same day just before and a short time after the signing. He seemed fully as rational on that day as I had ever seen him.  He, of course, was suffering some.  The pain caused him to keep his eyes closed considerably, even when he was fully awake.  I know that he retained nothing on his stomach after the injury.  He was constantly throwing up, and if morphine or anything was given him it was not retained in the stomach so it could act.  The upper part of the thigh bone was broken."

Cross-examination:  "He did not retain even water on his stomach.  He was scarcely competent to enter into the intricate mysteries of legal business like you (speaking to plaintiffs' attorney).  He might have, under certain conditions, signed a paper without knowing what he was doing, that is, if his hand had been raised and put to a pen without his being aroused.  There was no fever or inflammation.  I do not think there was a time during his last sickness and injury to the time of his death, that he was not fully competent to dispose of his property as he desired to, and he would know just how he was disposing of it.  After he was injured I heard him talk to several persons, and he always recognized them and talked rational."

Samuel Costelo, being sworn, testified as follows: "I have known Francis Searcy since 1862.  Was with him a great deal.  He had a strong and vigorous constitution. . He was able to transact pretty much all of his own business up to the hour of his death.  I saw him the Sunday after his leg was broken.  He knew me and his mind was sound—talked as rational as I ever heard him.  He was suffering considerably from his broken leg, and the pain seemed to make him keep his eyes closed a good deal.  He made his will after his leg was broken and after he signed deed in question.  I was present when

the will was made. He was of sound mind at that time and knew how he was disposing of his property. He never told me he was going to deed the land to his grandchildren, the defendants ; but he did tell me before the first deed was made that he intended to make provisions for them."

Cross-examination : "He was of sound mind when he made his will, and I think he was perfectly competent to make a will or deed."

David Taylor, being sworn, testified as follows : "I am not related to Francis Searcy. I had known him a long time. Before his leg was broken, his physical health was excellent. I met him in December prior to the accident and he was then as rational as any man in his talk. His mind seemed to be vigorous. I was at Francis Searcy's the night he made his will. He shook hands with John Palmer and others, calling them by their names. His mind was sound. When he talked his conversation was as rational as anybody's. He appeared a little stupid at times."

Cross-examination : "I heard his talk about his will. His mind seemed clear as to how he was going to dispose of his property. He appeared to be stupid at times, but when roused he was fully at himself."

John Perman, being sworn, testified as follows : "I had known Francis Searcy some twelve or fourteen years. I lived on his farm six years. I am a cousin to defendants. I had a conversation with Mrs. Martha Moore at Gallatin at the time the will was contested, and she told me that Francis Searcy's mind was clear up to the hour of his death. She was in favor of the will standing."

Samuel Hembaugh, being sworn, testified as follows : "I am not related to any of the parties. I have known Francis Searcy for many years. I saw him a short time before the accident in which his leg was broken and conversed with him. His mind was sound

Crowder v. Searcy.

and health good.  I saw him on Tuesday after the acci-
dent.  I spoke to him and he recognized me, and talked
to me about his leg and the accident.  His leg was pain-
ing him considerably.  He asked after my mother and
her family and his talk was as rational as anybody's.
I thought he was of sound mind at the time.  I do not
know whether I would have made a trade with him or
not or finished one that I had begun.  I know he talked
as well as he ever did and I noticed not the slightest
thing wrong with his mind."

Oliver Wigglesworth, being sworn, testified as fol-
lows :   " I saw Francis Searcy a day or two after his leg.
was broken.  I saw him shake hands with Mr. Taylor,
recognizing him, and ask how he was.  He talked per-
fectly rational and his mind was sound."

Cross-examination :   " Mrs.  Martha  Moore,  his
daughter, talked some to him  while I was there.   His
talk was rational.   Saw nothing which indicated in the
least that he was out of his mind.

Poss Searcy, being sworn, testified as follows :   " I
was in room where Francis Searcy was the Sunday he
was hurt.  He was in his right mind and acted and
talked as rational as I ever saw him.  His leg was pain-
ing him considerably.  I was also there the following
Tuesday and saw nothing to indicate that he was not of
sound mind.  Also, I was there the following Friday
when the will was made.  Thomas B. Crowder was
there.  Francis Searcy wanted to make a will but they
had no paper.  Thomas B. Crowder came to me to go
and get some paper on which to make a will.  I then
asked Thomas B. Crowder if Francis Searcy was of
sound mind so as to make a will.  He replied that Fran-
cis Searcy's mind was perfectly sound—as sound as it
ever was.  I was present when the will was made.
Francis Searcy talked and told how he wanted to dis-
pose of his property.  He spoke of all his property and
what he wanted each one to have.  He did not say

anything about any real estate. This was several days after the deed in question was signed. Defendants, Ada F., Martha E. and Effie M. Searcy are in possession of land described in deed in question."

Cross-examination: "I asked Thomas B. Crowder if Francis Searcy's mind was sound, because I knew Francis Searcy was in great pain from his leg."

Smith P. Searcy, being sworn, says: "I am a son of Francis Searcy, and the father of the defendants, Ada F., Martha E. and Effie M. Searcy. I heard my father on different occasions before the making of the deed say that he would make provisions for my three daughters, the defendants. I heard him tell them so, and he told me so. He told them they should have the land in the deed in question. My three daughters, the defendants, are in possession of the land mentioned in the deed in question and have been in possession ever since the making of the first deed long prior to father's injury. My father put the defendants, my daughters, into the possession of the land. I saw my father on several different occasions after his leg was broken, and his mind was sound. At the time my father made the first deed to my daughters, he had no land except what he deeded on that occasion to my daughters, the defendants, and what he deeded to Cassandra Crowder, one of the plaintiffs. At the time the deed of correction, the deed in question, was made my father had no land—he had deeded it all away. He had no land when his will was made."

Henry Adams, being sworn, says: "I had known Francis Searcy many years. Lived in his neighborhood. He had a vigorous constitution. I saw him after he was hurt and conversed with him. He was suffering a great deal, but he was perfectly rational and his mind was clear and sound to the hour of his death. I know the land mentioned in the deed in question. The defendants, Ada F., Martha E. and Effie

M. Searcy are now in possession of it, and have been since prior to Francis Searcy's getting his leg broken. Before his injury I had several conversations with Francis Searcy in which he talked about his property and how he was going to dispose of it. He spoke of his son, Smith P. Searcy, being a drinking man and throwing his property away, and that Smith Searcy would be apt to leave his family destitute; but that he (Francis Searcy) intended to deed the land mentioned in the deed in question to Smith Searcy's three girls, Ada F., Martha E. and Effie M. Searcy, so that they would not be left destitute. I was present at Francis Searcy's when the deed was signed. Was there when Mr. Moore came. Francis Searcy was in bed when I got there. I was with him some little time before Moore came, and while I was there and before Moore came nobody said a word about any deeds or pension papers. Thomas B. Crowder was there before I got there. Esq. Moore was in an adjoining room making out deed, and before anyone had told Francis Searcy what Esq. Moore was doing, he asked, ' Are those papers ready?' Mrs. Moore was about then. Esq. Moore came in with deed and said, ' Uncle Frank, here is the deed; it is just like the other one only the description of land is corrected.' Francis Searcy was wide awake and was looking at Mr. Moore. He had palsy so he couldn't guide his hand very well and Mr. Moore placed his hand to the pen and he made his mark. Esq. Moore asked him if he acknowledged it and Francis Searcy nodded his head. Just after the deed was signed, Francis Searcy told Mrs. Crowder to get some money out of his pocket book and pay Esq. Moore for the deed and pension papers. Esq. Moore said he wouldn't charge for the deed and took fifty cents for pension papers. Francis Searcy told Mrs. Crowder that she knew where to find the money. Francis Searcy was awake and looking at Moore when he took the deed out into the other room."

R. N. Moore, being sworn, says: "I am a justice of the peace of Jefferson township in this county. I have been a justice of the peace for ten or twelve years. I had known Francis Searcy for many years before he died. I did some business for him in the way of drawing and taking his acknowledgment to deed, fixing pension papers. Francis Searcy had not written any for several years prior to his death on account of palsy. He drew a pension. In February, before his leg was broken, Francis Searcy sent for me to make some deeds for him. I went over to where he lived. When I got there we talked on various subjects and then I asked him about the deeds he wanted made. He told me he wanted to deed the rest of his land to his three granddaughters, the defendants, Ada F., Martha E. and Effie M. Searcy. He said he wanted to give his said granddaughters this land so that they would not be destitute. He said he would attend to making the deeds in the morning. I staid all night. The next morning we proceeded to make out the deeds. By Francis Searcy's directions I made two deeds. In the first he deeded about fifty acres of his land to his daughter, Cassandra Crowder. In the second deed Francis Searcy deeded the balance of his land, some one hundred and ten acres, to the defendants, Ada F., Martha E. and Effie M. Searcy. He gave me the numbers of the land from tax receipts and from memory. He signed and acknowledged the two deeds. In signing the two deeds he made his mark, and in each signing I took his hand and placed it on the pen and he made mark. His hand shook so with palsy is the reason I had to place it on the pen for him. He could not guide his hand to as small an object as a pen. This deed to the three defendants, above mentioned, is what is termed the first deed. His mind was as sound as anybody's. He detailed to me the reason he was deeding this land to his said grandchildren. After he signed and acknowledged the

two deeds he said he would have Thomas B. Crowder to take them to Gallatin and put them on record. In March after that, I got word on Saturday to come to Francis Searcy's and make a deed of correction, as it seemed that the first deed contained an erroneous description of thirty acres of land put in this deed to the three granddaughters. But as the pension papers had not yet come I did not go over to make the deed for two or three days. As soon as Francis Searcy's pension papers came on I went over. But in the meantime Francis Searcy had got his leg broken. When I got there I found Thomas B. Crowder there and others. Martha Moore and Henry Adams were there. I went into a room adjoining the one in which Francis Searcy was lying. Thomas B. Crowder brought in the first deed I had made in February before and that I have spoken of in my testimony, and explained to me the mistake, that in describing the thirty-acre tract another thirty acre tract was put in that Francis Searcy had already deeded to his daughter. Crowder drew a plat and showed me. I then drew up the second deed, this one mentioned in the plaintiff's petition. This last deed contained the same number of acres as the first. While I was drawing the deed, and before Francis Searcy had seen me, I heard Francis Searcy call out, 'Are those papers ready?' When the deed was ready I took it in to the bedside of Francis Searcy. He was awake. Spoke to him and said, 'Uncle Frank, here is the deed ready for you to sign.' He turned towards me, his eyes open, and recognized me. I said to Francis Searcy, 'This deed is just like the one you made before, except the mistake in the description is corrected.' He raised his hand a little. I took his hand and placed it on the pen just as I had done when he had signed several deeds prior to that time, and he made his mark. I then asked him if he acknowledged the instrument he had signed to be his free act and deed for the purposes

therein mentioned, and he nodded his head.   I took up the deed, and then Francis Searcy spoke to Mrs. Crowder and told her to get some money and pay me for the deed and pension papers.   He told her where to find the money and told her she knew where the money was. I told Francis Searcy I wanted no pay for the deed since it was a deed of correction, and that fifty cents would do me for the pension papers.   The pension papers were signed after the deed.   I think he died on the tenth of March and the deed was made on the fifth of March.   I took the deed out and when I went out with it Francis Searcy was looking at me and wide awake and had just closed the conversation about the money to be paid to me.   I either left the deed just made and also the first deed with some member of the family for Thomas B. Crowder, or I left them in the other room for him.   Francis Searcy, in my opinion, was of sound mind when he signed this last deed."

This was all the testimony.

At the close of the evidence the court at the instance of the plaintiffs, and over the objections of defendants, instructed the jury as follows:   " Unless the jury find from the testimony that, at the time the deceased attached his mark to the deed in question he knew its nature and contents and signed the same as his own voluntary act and deed comprehending at the time its full scope and effect, then the said deed is void, and the jury should find for the plaintiffs."

" Although the jury may believe that the deceased had some mental capacity remaining, yet unless they find that at the moment of making his mark he knew and comprehended the full scope, nature and contents of the deed in question, and intended at the time to execute the same, then the said deed is void and the jury should find for the plaintiffs."

The   court   at   the   instance   of   the   defendants instructed the jury as follows :  "The jury are instructed

by the court that it devolves upon the plaintiffs to show by a preponderance of the evidence, that Francis Searcy, at the time the deed was signed, had not sufficient mental capacity to comprehend the same."

"The jury are instructed by the court, that they are the sole judges of the weight of the evidence and the credibility of witnesses, and they ought to give to the testimony of each witness such weight only as they may think it justly entitled to."

In addition to the foregoing instructions, the court, at the suggestion of plaintiffs' counsel, submitted the following interrogatories to the jury. The answer to each interrogatory given by the jury being written down immediately after each question :

"*First.* Were the contents of the deed in suit explained to the deceased at the time ?   *A.* Yes.

"*Second.* Did the deceased know at the time that he was signing the deed in question ?   *A.* We believe he did.

"*Third.* Did the deceased know the contents of the deed in question ?   *A.* We believe he did.

"*Fourth.* Is it disclosed by the testimony that any one had told the deceased that the original deed was to be corrected ?   *A.* We believe it is.

"*Fifth.* If so, who told him ?   *A.* We believe Thomas B. Crowder.

"*Sixth.* Did the deceased direct anyone to prepare the deed in question ?   *A.* We believe he did.

"*Seventh.* If so, whom ?   *A.* Thos. B. Crowder.

"*Eighth.* And if so, when ?   *A.* When error was explained in former deed.

"*Ninth.* What authority did deceased give Crowder to put the deed in question on record ?   *A.* By same authority as in former deed.

"*Tenth.* Did the deceased understand the nature and contents of the deed in question ?   *A.* Yes.

"*Eleventh.* If so, how and from whom did he derive his information? *A.* Esq. Moore.

"*Twelfth.* Did the deceased direct anyone to either deliver the deed in question to the grantees, or to have the same recorded? *A.* Yes.

"*Thirteenth.* If so, how and when? *A.* When he delivered the original deed.

"*Fourteenth.* Was the deceased, at the time that his mark was placed upon the deed in question, fully informed of its contents, and did he comprehend its nature and extent? *A.* Yes."

At the suggestion of defendants' counsel, the court submitted interrogatories as follows, answers to which by the jury are written after each question:

"*First.* Had Francis Searcy at the time the deed was signed sufficient mental capacity to comprehend the act of signing? *A.* Yes.

"*Second.* At the time the deed was signed, did Francis Searcy sign the same with the intent of conveying the lands therein described, to the grantees therein mentioned, to-wit: Ada F. Searcy, Martha E. Searcy and Effie M. Searcy? *A.* Yes.

"*Third.* Was the deed after it was signed, taken with the consent of Francis Searcy by R. N. Moore, justice of the peace, and, by consent of said Searcy, left by said Moore at the house of H. S. Crowder, in order that grantees therein or some one for them might receive said deed? *A.* We believe it was.

"*Fourth.* Was the deed in question placed on record by Thomas B. Crowder by the authority, express or implied, of said Francis Searcy? *A.* Yes.

"*Fifth.* When Thomas B. Crowder placed said deed on record, was he acting as the authorized agent of Francis Searcy in that respect? *A.* Yes.

"*Sixth.* When Francis Searcy signed said deed, was he aware of what disposition he was making of his property mentioned in said deed? *A.* Yes."

In addition to answers to interrogatories, the jury returned a verdict for the defendants. This was on the seventeenth of February, 1887, and afterwards, on the twenty-second of February, the court rendered the following finding and decree, to-wit: "Now at this day the court having seen and heard the testimony herein doth find that certain deed dated on the fifth day of March, A. D. 1883, and recorded at page 282, of book 44, of the records in the office of the recorder of deeds within and for the county of Daviess and state of Missouri, and whereby it was purported that one Francis Searcy conveyed to Ada F., Martha E. and Effie M. Searcy, the following real estate, viz.: All that part of the southwest quarter of southeast quarter, section 6, contained inside the fence around said house and lot on said forty acres, containing eight acres more or less. Also twenty acres off east side of west half of southeast quarter, section 7; also sixty-five acres more or less, part east half twenty, southeast, section 7; also two acres more or less, out of northwest corner, northwest quarter, section 8; also four acres more or less, off southwest corner, section 8; all in township 59, range 29, was and is null and void, and was never by the said Francis Searcy delivered to said supposed grantees. Wherefore, said deed is by the court decreed to be null and void and for naught held, because never delivered. And it is further adjudged and decreed that said Ada F. Searcy, Martha E. Searcy and Effie M. Searcy take nothing by said deed, but that the title to said lands be vested in the heirs at law of said Francis Searcy, as though such deed had never been made or recorded. And it is further adjudged and decreed that plaintiffs recover of the defendants their costs in this behalf expended."

And afterwards on the same day defendants file their motion for new trial as follows: "Now come the defendants and move the court to grant them a new hearing for the reasons :

"*First.* Because the finding of the court, that there was no delivery of the deed in controversy, is against the evidence.

"*Second.* Because the finding of the court, that the deed was not delivered, is against the law.

"*Third.* Because the finding of the court, that there was no delivery of the deed, is unsupported by the evidence.

"*Fourth.* Because the court erred in disregarding the finding of the jury, that there was a delivery of the deed.

"*Fifth.* Because the court erred in sustaining plaintiffs' motion to strike out part of defendants' answer.

"*Sixth.* Because the court erred in disregarding the answer of the jury to an interrogatory propounded by defendants (written by mistake plaintiffs) as to the delivery of the deed.

"*Seventh.* Because the court erred in giving improper instructions to the jury on the part of plaintiffs."

The circuit court, by its decree, adopted the finding of the jury, that Francis Searcy, at the time of the execution of the deed sought to be annulled, was of sound mind and understood and comprehended the act, and that said deed was executed and acknowledged by him, but it declined to adopt the finding of the jury that this last deed was delivered by Francis Searcy, within contemplation of law.

Only two questions then are left for our decision. The first is one of pleading.

The court on motion of plaintiffs struck out all that portion of defendants' answer, which set up the execution and delivery by Francis Searcy, the father of plaintiffs, of a prior deed to those same lands. The ground of the motion simply was that these facts were irrelevant, redundant and constituted no defense. No authority sustaining this view has been cited by the learned

counsel for respondents, and we have not been able to find any. Our statute, section 2050, Revised Statutes, 1889, permits a defendant to set forth in his answer as many defenses as he may have, whether they be legal or equitable, or both. The only limit being that they must be consistent, and this consistency must be one of fact merely. *Ledbetter v. Ledbetter*, 88 Mo. 60.

Keeping in mind then, that plaintiffs' sole claim and right to attack this last deed arose from their being the heirs at law of Francis Searcy, and granting for argument's sake that there was no delivery of this deed, what rule of equity or consistency would be violated by permitting them to prove that plaintiffs' ancestor, from whom they deduce their only title and right to inquire into the delivery of this last deed, had, long prior to his death and execution of this last deed, made and delivered a deed conveying this land to defendants?

Would not the proof of this fact demonstrate that plaintiffs have no standing in court, and is it inconsistent for a man to correct a deed or even by mistake make two deeds? We think not. The defendants' title was attacked. They were in possession of lands by virtue of two deeds from their grandfather. His heirs were attacking their right. By every principle of right and consistency they were entitled to show that plaintiffs were estopped by their father's deed. The circuit court erred in striking out this portion of defendants' answer.

The only remaining question, and a vital one in this cause, is, did Francis Searcy deliver the deed of date March 5, 1883, to defendants? "The delivery of a deed is essential to the transfer of the title. It is the final act, without which all other formalities are ineffectual." *Younge v. Guilbeau*, 3 Wall. 636.

But, while this is true, it is not necessary to pursue any particular form or course to effect a delivery. The whole object of a delivery is to indicate an intent upon the part of the grantor to give effect to the instrument. In *Cannon v. Cannon*, 26 N. J. Eq. ( 11 Green C. E. ) 316,

the court says : "To make a delivery of a deed, it is not necessary it should actually be handed over to the grantee, or to another person for him. It may be effected by words without acts, or by acts without words or by both acts and words. Indeed, it may be made, though the deed remains in the custody of the grantor."

Thus if both parties are present when the usual formalities of execution take place and the contract is fully carried out, and nothing remains to be done except the empty ceremonies of passing the deed from grantor to grantee, the law, regarding the substance and disregarding the form, will adjudge the title passed, even though the deed should remain in the custody of the grantor.

The rule in this state has been settled by the decisions in the cases of *Tobin v. Bass*, 85 Mo. 654, and *Standiford v. Standiford*, 97 Mo. 231, that "when a deed to a minor from his father is absolute in form and for his benefit, and the grantor voluntarily hands the same to a third person, telling him to have it recorded and to keep it safe, and such third person after the death of the grantor delivers the deed to the recorder for record, the second delivery has relation to the first and it is a deed *ab initio*."

"The law presumes much more in favor of the delivery of deeds in the cases of voluntary settlements, especially when made to infants than it does in ordinary cases of bargain and sale." *Bryan v. Wash*, 2 Gilm. 568.

In this case, the grandfather had voluntarily executed a deed to the defendants, his granddaughters. He had partitioned his estate among his children. He was seeking to preserve these granddaughters from want on account of their father's dissipation. He had declared his intention of making this deed more than once. Under the impression that the first deed was accomplishing his purpose, he handed it to Thomas

Crowder v. Searcy.

Crowder and gave him the money to record it.   When he did this, we hold that the first deed was fully delivered and the title passed to the defendants, even though there was a misdescription.   A court of equity would have corrected the description.   Equity regards that as done which ought to be done.

Crowder discovered the mistake.   He brought the deed back and informed Francis Searcy of the mistake. Searcy did not demand a return of the deed.   He left the money to record the deed in Crowder's hands.   He afterwards appears anxious to have "the papers," this deed and the pension papers, completed.   Called out from his bed, to know if they were ready.   He is assisted in the execution.   Immediately after the execution and acknowledgment, he calls for money to pay the justice for the preparation and acknowledgment of the deed.   The jury and the circuit judge who tried the cause were satisfied he was fully aware of the execution and purpose of this deed.   His intention is unquestioned.

This second deed is so intimately connected with the first, that we are bound to so construe the acts of this old grandfather, that the power to record the first deed and the money left in the hands of Crowder were continued and intended to attach to the corrected deed. This we are satisfied was his intention.   Crowder so construed it.   He did record the deed as corrected.   In equity the two constitute one paper and one transaction, and the placing the deed of record was the culmination of the power delegated.

We hold, therefore, that the circuit court erred in decreeing this deed was not delivered, and the said decree and judgment is reversed, and, as the plaintiffs' own evidence shows they have no merit or standing in a court of equity, their bill is dismissed.   All the judges of this division concur.