MARSHALL, J.
This case is here upon second appeal. Upon the first trial in the circuit court the plaintiffs obtained judgment, which was reversed by this court on appeal because of the exclusion by the circuit court of the testimony' of Catherine McCracken, widow of John A. McCracken, as to *595 tlie delivery of a deed to hex husband by her son James Mc-Cracken. [140 Mo. 348.] On a trial anew in the circuit court the plaintiffs again had judgment and defendants ap" pealed.
The facts briefly stated are these: On and prior to June 19th, 1888, James McOracken was heavily in debt. Lie owed his father, John A. McOracken, about $4,000 which was unsecured. He owed Shanklin & Austin, his bankers, about $5,000 which was secured, and about $6,000 which was unsecured. He was having serious trouble with his wife Laura, who threatened him with legal proceedings and with personal violence. It was deemed advisable to divest her of her dower interest in his property. Accordingly it was arranged that she should join him in conveying his property to some third person, and that he should join her in conveying 140 acres of land she owned in Sullivan county to some one else so as to cut out his interest in her property. W. E. Austin, of the banking firm of Shanklin & Austin, was liis special friend and adviser, and E. M. Ilarber acted as his attorney, while John P. Butler acted as her attorney. Austin furnished the $700 which it was agreed he should pay his wife for relinquishing her dower in his land. It was discussed for quite a while as to who should be the grantee in the-deed from him and his wife. Austin and Harber and Shanklin were suggested but were not selected as the grantee. After considerable delay John A. McOracken was agreed upon as the grantee, his name was inserted in the three deeds, which had been prepared previously and the deeds were left in the hands of James McOracken. John A. McCracken lived in the country, and knew nothing of the deeds at or before the time of the execution. James McOracken had a box in Shanklin & Austin’s bank, in which he kept his deeds and other valuable papers, and John A. McOracken had-an envelope in the same bank, where he kept his papers. There-is testimony to show that James McOracken and Austin had previously *596 discussed the former’s financial condition and that it was contemplated that as soon as his wife’s dower was divested, he should borrow money in the East, at a low rate of interest, so as to pay up his debts, including what he owed Shanklin & Austin. The testimony of all the witnesses, Austin, Harber, Butler, and James McOracken, who were present when the deeds were made shows beyond any reasonable doubt that the purpose in making the deeds was simply to divest the dower interest of the wife of James McOracken, and nothing whatever was said at that time (or before) about conveying the property to secure what James McOracken owed his father John A. McOracken. Immediately after the deeds were made they were placed in James McCracken’s box in the bank.
None of the three deeds were recorded prior to September 4th, 1889, the day on which John A. McOracken died. One of them was filed for record on the 23d of August, 1890, and the other two on the 22d of December,1890, the day on which the land was sold by the sheriff under the plaintiff’s execution against James McOracken.
The defendants base their claim that the deeds were delivered to John A. McOracken, upon the testimony of James McOracken, his mother Catherine McOracken, and his sister Mattie McCracken.
James McOracken testified that after the deeds were executed he carried them to his father’s residence in the country and there delivered them to him, and that his father handed them back to him and told him to put them where they would be safe, and that the next day he took them back to the bank and placed them in his (James’) box in the bank, where they remained until August, 1890, when, by direction of his brother, who was the administrator of his father’s estate, he, James, took them out of the box and had one of them recorded. It appears however from a deposition of James Mc-Oracken, which had been taken in the early stages of this *597 litigation, that he said then, that it was not the intention when the deeds were made that they were to be delivered to his father. Catherine McCracken testified that her son James brought two deeds to their residence in the country and gave them to her husband John A. McCracken, while he was standing by the well; that she did not read the whole of the deeds but did read enough of them to see that they were from “Jim and his wife” to her husband; that Jim stayed all night and she saw something like deeds in some of his clothing which was lying on the bed; that she could not remember what her husband did with them after her son gave them to him. Mattie McCracken testified that she was not at home the day James brought the papers, but that the next morning when she was cleaning up the room in which James had slept the night before, she picked up his coat off the carpet; that “the papers were a little bit slipped out of the coat;” that her mother was present and wanted to examine the papers, but she said them were Jim’s; that when her mother “slipped them part of the way out I saw they were the size of deeds,” but she did not examine them.
After John A. McCracken’s death, the assignees of Shanklin & Austin, who had failed, brought suit against James McCracken to recover what he owed the bank, and on the,3d of May, 1890, obtained judgment against him for $'7,849.Y'7, and caused execution to issue thereon, under which, on the 22d of December, 1890, the sheriff sold the land, and Nathaniel Shanklin, one of the assignees, became the purchaser as trustee’for J. LI. Shanklin and W. E. Austin, the assignors, the assignment having been closed and all debts and liabilities of the bank having been paid.
Thereafter this suit was brought against the legal representatives and heirs of John A. McCracken to set aside the conveyance from James McCracken to John A. McCracken and to vest the title in the plaintiff.
*598 The answers of the defendants, except that of the administrator, admitted the execution of the deed and denied all the other allegations of the petition. The answer of the administrator claims that the deed from James to his father, though absolute in form, was intended as a mortgage to secure what James owed his father, and that as Austin advised the making of the deeds so as to get rid of the dower interest of his wife and furnished James the $700 needed for the purpose, “the plaintiff is estopped from asserting or maintaining* that said deeds were executed in fraud of the rights of plaintiff or his assignors, and from denying that said deeds were made, executed and delivered as security for the payment of the indebtedness due by said defendant James to his father, said John A. McCracken.”
The plaintiff recovered judgment in the circuit court, as prayed, and the defendants appealed.
I.
The first question presented by this record for adjudication is whether the deeds were ever delivered to John A. Mc-Cracken.
This is a proceeding in equity where all the evidence is open to review here, but we have frequently held that while not concluded by the judgment below, we will accord it proper deference, because the testimony" being oral, that court has better facilities for giving proper weight to the testimony of the witnesses, seeing their behavior on the stand and manner of testifying, than we have. [Parker v. Roberts, 116 Mo. l. c. 667 ; Mathias v. O’Neill, 94 Mo. l. c. 529 ; Chouteau v. Allen, 70 Mo. l. c. 336 ; Sharpe v. McPike, 62 Mo. l. c. 307.]
The defendant administrator contends that the deed, though absolute on its face, was really a mortgage to secure the indebtedness of James to his father John, while the plaintiff contends that if such was the intention of the son and *599 father, it will be held good as between them but void as to creditors, and supports his contention by citing- the following-cases : State to use v. Benoist, 37 Mo. 500 ; Donovan v. Dunning, 69 Mo. 436 ; State to use v. Bell, 2 Mo. App. 102 ; Molaska Mfg. Co. v. Steele, 36 Mo. App. 496 ; First National Bank v. K. C. Lime Co., 43 Mo. App. 561 ; Beidler v. Crane, 135 Ill. 92 ; Lukins v. Aird, 6 Wall. 78 ; Chenery v. Palmer, 6 Cal. 119 ; Sims v. Gaines, 64 Ala. 392 ; Winkley v. Hill, 9 N. H. 31 ; Lank v. Stockwell, 55 N. H. 561 ; Connelly v. Walker, 45 Pa. St. 449 ; Gregory v. Perkins, 4 Dev. Law (N. C.) 50 ; North v. Belden, 13 Conn. 376.
It is not necessary to discuss or decide this question in this case, for there is no evidence in this record which supports the contention that the deeds from James'to his father were intended as mortgages to secure what James owed his father. The sole purpose of the deeds was to divest the wife’s dower interest in the land. Shanklin & Austin furnished the $700 to buy her interest, and it is too plain to admit of discussion that they would not have furnished the money if the purpose was to secure the debt to the father, for that would leave them unsecured themselves; neither would they have consented to a preference of the father over themselves. In short, the conveyance to the father was made after other grantees had been suggested, and the father became the holder of the legal title in trust for the son James.
It is claimed by plaintiff that the deed from James to his father, John, was never delivered and hence never took effect as a conveyance.
A delivery of a deed is necessary to pass the title, just as livery of seizin was necessary at common law. [Ebersole v. Rankin, 102 Mo. 488 ; Tyler v. Hall, 106 Mo. l. c. 319 ; Kingman & Co. v. Cornell-Tebbetts Buggy Co., 150 Mo. 282.] Under some circumstances a delivery of the deed may be good although it remains in the custody of the grantor. [Standiford v. Standiford, 97 Mo. 231 ; Crowder v. Searcy, 103 Mo. *600 97; Sneathen v. Sneathen, 104 Mo. 201 ; Ramsey v. Otis, 133 Mo. 85.] But where the question arises between the creditors of a grantor and the grantee in the deed, the delivery will be much more closely scrutinized and clearer proof will be required than in cases where there is no question of fraud, actual or constructive, involved, as where the contestants claim only as the heirs or legal representatives of the grantor, and for the reason that the creditors have a right which may be affected by the conveyance, while the heir has only a privilege of succession under the grantor which the law accords him, but which does not involve an interest in the thing transferred.
The evidence in this case is far from being satisfying that the deeds ever were delivered by James to his father. The testimony of his sister Mattie that she saw some papers the size of a deed- in James’ coat pocket the day after the delivery is alleged to have been made, proves absolutely nothing, for she did not examine them and does not even state that they were deeds — only that the papers were the size of deeds — nor does she testify that they were the deeds in question here. The testimony of Catherine, the mother, is that she saw James hand her husband, John, two deeds, which she examined far enough to see that they were from “Jim and his wife” and that they were deeds “to John and Catherine McCracken,” but she does not know what her husband did with them, is also lacking in probative force to prove the delivery of the three deeds here involved from James to John (not John and Catherine) to the lands in controversy. The testimony of James stands practically alone, and he shows that the deeds were not intended to be delivered, either as absolute conveyances or as mortgages, but his father’s name was inserted in them as the grantee after several others had been considered, and that the sole purpose of making them was to get rid of the dower interest of his wife. He testifies that he took the deeds out of his box in the bank, carried them *601 to liis father in the country, on the day after they were executed, delivered them to his father, who handed them back to him and directed him to put them in a safe place, and that he then took them back to the bank and put them in his (James’) box, where they remained until nearly a year after his father’s death, when upon the advice of his brother, who was the administrator of his father’s estate, he took them out of his (James’) box, and filed one for record in October, 1890, and the other two on the same day the land was sold under the execution on the judgment against him and in favor of the bankers.
When we place this testimony by the side of the admitted' facts, 1st, that the deeds were made simply to divert his wife’s dower; 2d, that the bank furnished the $700 for James to buy his wife’s dower interest; 3d, that it was not the intention to prefer the father’s debt over that due the bank; 4th, that the deeds were never intended to be delivered to the father; 5th, that after the date of the alleged delivery, the father told the bankers he knew nothing of Jim’s affairs and wanted to talk to the bankers about them; 6th, that James was to borrow money at a low rate of interest in the East and secure the loan with this property, so as to pay off all his indebtedness, the delivery of the deeds does not appear to be established by the testimony, and the other facts and circumstances disclosed by this record, and in this state of the record, this is a proper case for not interfering with decree of the lower court.
n.'
But even if the delivery of the deeds to John be conceded, the testimony shows that the conveyance to him was simply as trustee for James, to enable the latter to get rid of his wife’s dower, and further to put him in position so he could' the better handle the property in securing loans from Eastern' capitalists. There was absolutely no consideration paid by *602 John to J ames for the conveyance. As absolute conveyances, and as voluntary gifts, they could convey no title as against the creditors of the son. The testimony will not bear the construction that the deeds were intended as mortgages to secure what John owed his father, as we have shown above.
The whole case leads to' but one conclusion, that the deeds, whether delivered or not, vested the property in John simply in trust for James and as such the property remained subject to the claims of the creditors, and that by proper legal proceedings the plaintiff has acquired the title thereto.
It follows that the judgment of the circuit court was right, and it is therefore affirmed.
Gantt, O. J., Brace and Robinson, JJ., concur in 2d paragraph and in the result; Yalliant, J., concurs; Burgess, J., not sitting; Sherwood, J., absent.