Bruegge v. Bedard.

---

## JOHN H. BRUEGGE, Respondent, v. FRANCIS W. BEDARD et al., Appellants.

### St. Louis Court of Appeals, May 7, 1901.

1. **Deed of Trust: WIFE AS SURETY.** In the case at bar, if the loan was made to Mr. Bedard and he got the money, and the land on which the deed of trust was given belonged to his wife, her position is that of surety to him.

2. ———: ———: EXTENSION OF TIME: RELEASE OF SURETY. And if the wife knew of and assented to the extension of time given on the note, she is not discharged.

3. ———: ———: ———. Neither is the land released from the incumbrances, and nothing short of payment will release the land, as the property is still pledged for the payment of the debt.

4. **Practice, Trial: PRACTICE, APPELLATE.** In doubtful chancery cases it is proper for an appellate court to defer to the finding of the trial court.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

AFFIRMED.

*Adiel Sherwood* with *R. J. Delano* for appellants.

(1) The position of Mrs. Bedard is that of a surety, and this is so because she did not sign any of the old notes or any of the new notes; in other words, all of the notes mentioned in the testimony were the notes of Francis W. Bedard, her husband. (2) As a surety for the husband, the wife stands in exactly the same position before the law as any other surety. Wilcox v. Todd, 64 Mo. 388; Barrett v. Davis, 104 Mo. 549; Sheldon on Subrogation (2 Ed.), 154; Albion Bank v. Burns, 46 N. Y. 170; Savage v. Winchester, 15 Gray (Mass.), 453. (3) An extension of time for the payment of a note by giving new notes, releases the surety, except where the surety has knowledge of the transaction and expressly consents thereto. Barrett v. Davis, 104 Mo. 549; Smith v. Worman, 19 Ohio St. 148; Morgan v. Martin, 32 Mo. 438; Schuster v. Weiss, 114 Mo. 158.

*Kehr & Tittmann* for respondent.

(1) There is nothing in the record showing or tending to show that defendant Mary Ann Bedard was either the legal or equitable owner of the real estate described in the deed of trust from Francis W. Bedard and Mary Ann Bedard, his wife. Defendants wholly failed to offer any evidence on that subject. Hence, the entire defense as to her supposed position as surety fails. The burden is on the wife not only to establish the fact of the suretyship, but that the creditor, at the time of the act complained of, knew that she stood in the situation of surety. She must be holden to strict proof. Gahn v. Niemekewitz Ex., 11 Wend. 312, l. c. 323; Niemekewitz v. Gahn, 3 Paige Chy. 614; l. c. 651; 1 Brandt on Suretyship (2 Ed.), p. 44, sec. 35. (2) Neither did the fact of suretyship, if any such existed,

appear from the obligation, and there is no proof that plaintiff knew of it, when he granted the extension. The surety, therefore, if such she was, was not discharged. 2 Brandt on Suretyship and Guarantee (2 Ed.), p. 546, sec. 375, and cases cited; Pratt v. Conway, 148 Mo. 291, l. c. 297, 298. (3) Even in equity cases, an appellate court will, unless the chancellor has manifestly disregarded the evidence, defer to his finding on oral evidence, on account of the superior advantages he possessed for weighing the evidence and judging of the credibility of witnesses. Shanklin v. McCracken, 151 Mo. 587; Warren v. Nickles, 72 Mo. App. 489; Hartley v. Hartley, 143 Mo. 216; Swon v. Stevens, 143 Mo. 384.

GOODE, J.—This is a suit in equity to set aside certain deeds of release, hereafter mentioned, and to foreclose a deed of trust which was executed on real estate in the city and county of St. Louis on the first day of February, 1895, by Francis W. and Mary Ann Bedard to August Gehner, trustee for John H. Bruegge, *cestui que trust*. The deed of trust was given to secure a promissory note of twenty-five hundred dollars and six interest notes of seventy-five dollars each of the same date. The large note represented a loan which was procured by one or both the Bedards, who then lived in Chicago, through Ephriam G. Obear, a real estate and loan agent of St. Louis. Mr. Bedard applied for the loan and Bruegge furnished the money. It passed through Obear's hands, who testified that he paid the sum by check to the order of Mrs. Bedard. He made out his account against her and sent the check payable to her order to her husband. It seems that Bedard had written to Obear from Chicago to get him a loan. When the principal note was about to fall due the following correspondence took place:

Vol 89 app—35

"Ft. Wayne, Indiana, December 8, 1897.
"John H. Bruegge, Esq., St. Louis, Mo.:

"Dear Sir:—Will you extend the loan you made me for three years more, from February 2, 1898, and do you wish a lease of the five acres for three years more from same date? *Please answer on this sheet what you wish to do,* and oblige,

"Yours truly,
"F. W. BEDARD."

Plaintiff answered said letter on December 9, but it is not quite clear whether the answer is in the record or not. This letter was written in reply to his answer:

"Ft. Wayne, Indiana, December 11, 1897.
"John Bruegge, Esq.,
    "4340 Derby street, St. Louis, Mo.:

"Dear Sir:—In reply to your letter dated December 9, 1897, I agree to lease you the five acres of land for three years, dating from February 2, 1898, and will accept the continuance of the loan of $2,500 for three years more from February 2, 1898, and will pay the interest to *R. J. Delano, as in the past,* which I hope will be satisfactory. *Hoping you are well, and wishing you good health and happiness,* I am,

"Yours truly,
"F. W. BEDARD."

The plaintiff and Bedard were slightly acquainted; the former was a tenant of the latter, which explains the second letter. A new note for twenty-five hundred dollars and six semiannual interest notes for seventy-five dollars each were prepared by R. J. Delano, attorney for Mr. Bedard, and sent to Ft. Wayne, Indiana, where Bedard then resided, signed by him and returned by his wife, as we believe, to Delano in St. Louis.

Bruegge v. Bedard.

About the time they were returned this letter was written:

"Ft. Wayne, Indiana, February 9, 1898.
"Mr. John H. Bruegge, Six Mile House,
    "Natural Bridge Road, St. Louis, Mo.:
  "Dear Sir:—Call on R. J. Delano and I think you will find everything satisfactory.
            "F. W. BEDARD, *per Mrs. F. W. Bedard.*"

The following was also written by Delano to the plaintiff:

"St. Louis, Missouri, February 10, 1898.
"Mr. John H. Bruegge, Six Mile House,
    "Natural Bridge Road, St. Louis, Mo.:
  "Dear Sir:—I have received the notes which you require of Mr. Frank Bedard and if you will bring the notes, which you have now, to my office, I will hand you the notes which you desire.                    "Very truly,
            RUFUS J. DELANO, per R."

There must have been some correspondence prior to any of the previous letters, because the following letter speaks of one that had been written by Bruegge to Bedard sometime earlier:

"Mr. F. W. Bedard:
  "Dear Sir:—I received your letter and answered it October the first.   I will let you the money the $2,500 longer at the time from 1898 till the year 1901, if you wish to have it.   I will be satisfied with it the way you wrote to me and I will rent the five acres of ground for four years longer till the year 1901 for $50 a year.   We can make our own settlement as you have written to me I will be satisfied.   *Mr. Bedard I am going to ask you if the debt runs due, if we have to make a new deed*

*or just make a note.   You know it better than I do.*   So please answer soon as possible.   I remain,

"Yours truly,
"JOHN BRUEGGE."

That letter was taken down by Frank P. Ruhr, a clerk in Delano's office.   After getting the notice from Delano, Bruegge took the old notes to his office where he says the following colloquy passed between them:

"Q.   What was done there; what did he say and what did you say?   Tell the court everything that occurred there in your own way?   A.   Well, he says then, 'Mr. Bruegge, I got the notes here from Mr. Bedard; have you got the old ones in?'   'Yes, sir.'   'Give me the notes.'   I handed him the notes, and he says, 'All right.'   I says, 'Mr. Delano, is the notes all right?'   'Yes,' he says, *'You got the deed of trust there; that shows.'*   So he gave me the notes, and I gave him that note there.   Two days after that I got this letter. . . .

"Q.   You gave him the old $2,500 note?   A.   Yes.

"Q.   Did he ask you for the deed of trust?   A.   No, he says: 'The deed of trust is all right; that shows'—I told him that the notes—if that was all right.   He says, 'Yes, your deed of trust shows that the notes are right.'"

Plaintiff kept his deed of trust, turned the old notes over to Delano and took the new ones, signing his name on the back of them by the latter's direction as this evidence shows:

"Q.   I will ask you how you came to put your name on the back of those old notes; how did that happen?   A.   That happened this way.   Mr. Delano says, he says, 'You have to show the notes,' he says, 'You have to put your name down.'   'That wouldn't do.'   'Yes, like you was to take a note and go to any bank and get so much money; you get the old notes; you put your name on the backside and you get new notes.   The same

thing here.' So I done that."

Sometime afterwards one William F. Hoffman, executed two quitclaim deeds by which he purported to release the aforesaid deed of trust as the holder of the notes which it was given to secure. These releases are dated the first day of June, 1899, about a year and a half after the extension was granted. They were prepared in Delano's office and acknowledged by Hoffman before his clerk, Ruhr. Hoffman is a non-resident of the State and very little was shown about him in the testimony. He was brought to said law office and introduced by Bedard, who testified that he lived in Colorado and was a promoter, but could not remember how or when he got the notes or whether he, Bedard, turned them over to him. Bedard's memory was very bad about the transactions. He could not even tell whether Hoffman ever had the notes in his possession or not, but undertook to excuse his lack of certainty several times by saying he was under oath. Obear swears he came to him and wanted some plan proposed by which the deed of trust could be released, either by a deed of release or some other way, but Obear declined to prepare such an instrument. Mr. Bruegge, who held the deed of trust and was the beneficiary in it, was never asked to release it. Delano and his clerk testified that the former apprised Bruegge at the time of the exchange of notes that it would have the effect of discharging the security on the land unless Mrs. Bruegge consented to the extension. Bruegge denied this. The circuit court found that Francis W. and Mary Ann Bedard were both parties to the contract for an extension of the original debt and agreed that the deed of trust should remain and stand as security for the indebtedness during the three years for which it was renewed, and in accordance with said agreement made between the plaintiff and said defendant, plaintiff surrendered the first principal note to the defendants and made and delivered to him the renewal

notes, that the deeds of release were executed by Hoffman without the knowledge and consent of the plaintiff at the instigation of the two Bedards for the purpose of fraudulently discharging the latters' real estate from the incumbrance; that the recitals in the quitclaims that the original debt had been fully paid, that Hoffman was assignee of the notes and that the land should be released, were false; that the plaintiff had never transferred nor assigned the notes and deed of trust to any person whatever, and that the releases were a fraud on his rights. The releases were decreed to be cancelled and for naught held, the deed of trust was reinstated as a valid and subsisting lien and other relief not necessary to mention was adjudged.

If this loan was made to Mr. Bedard and he got the money, and the land on which the deed of trust was given belonged to his wife, her position is that of a surety for him. Wilcox v. Todd, 64 Mo. 388; Barrett v. Davis, 104 Mo. 549. It seems to be conceded by both sides that the acceptance of the new notes by Bruegge was a sufficient consideration to support the extension of the time of payment of the original debt; which would therefore release Mrs. Bedard if she was merely a surety and did not consent to the extension. We reserve our opinion on that point. We have been unable to find any allegation in the pleadings or any proof in the record that the land covered by the deed of trust belongs to Mrs. Bedard, which leaves the defense without a base. But we will discuss the case on the supposition that she owns the land. If she got the money she was not a surety but a principal. Vogel v. Leichner, 102 Ind. 55. If she was a principal, the land, even if it belongs to her, was not released from the lien of the deed of trust by the extension.

Mr. Obear swears that he sent the check payable to her order and also handed an account to her, we suppose for his

commission. All the facts of the case, except that she did not sign the notes, point to the conclusion that she was as much a principal in the transaction as her husband. They swear to the contrary, but neither their conduct nor their testimony is of a character to recommend them to the confidence of a court.

In this chancery cause the substance of the arrangement by which the first principal note was surrendered and new ones falling due three years later were taken, must be regarded, rather than the form. Pomeroy v. Benton, 57 Mo. 531; St. Louis & San Francisco Ry. Co. v. Gracy, 126 Mo. 472. There is no room for doubt that Bedard requested an extension of the original debt just before it matured, with the understanding that the loan was to continue to be secured by the deed of trust just as it had theretofore been, and that Bruegge granted the request with the same understanding on his part. It passes belief that he should have intended to give up a loan well secured on real property, where he lived, and take in lieu thereof the unsecured notes of a man living in another State, with whom he was but little acquainted. Like the chancellor below, we refuse to accept so unreasonable an explanation of the affair. The scheme to corruptly get rid of the lien of the deed of trust may have been conceived afterwards, but there are ear marks in the evidence which arouse suspicion that it was in mind when the extension was procured. The mysterious Hoffman flitted across the scene just long enough to promote the dishonest purpose, after Obear had refused to lend himself to it. The idea that Hoffman owned the old notes in good faith or that Bruegge had assigned them, either with the intention that some one else should enjoy the security of the deed of trust or that it should be released, will not bear inspection. Hoffman was plainly a tool used to perpetrate a fraud.

It is scarcely denied that Bedard's conduct was sinister.

The real defense is that his wife was not a party to it, knew nothing of the extension, did not consent thereto and that her land was consequently released. But a careful reading of the record leaves us without a doubt that she knew all about the extension and actively assisted in procuring it. She admitted, herself, writing one letter to the plaintiff for her husband. Both he and she testified that he was ill' at the time the correspondence was being conducted. She says that at that time her husband "was very ill, dangerously ill with erysipelas, blind could not see at all and not expected to live." She was then asked these questions.

"Q. You said before on your examination your husband was too sick to write? A. Yes.

"Q. Was he too sick to attend to the sending of those notes (namely the extension notes)? A. I don't think he sent them; *they could not be sent unless they passed through my hands.* He just dictated the letter that was all. I never saw them."

Now in connection with this, let us note what Bedard testified.

"Q. (By the Court): Where did you sign the new notes, the notes of renewal? A. I signed them in Ft. Wayne, Indiana.

"Q. Who sent them on to you? A. Mr. Delano.

"Q. Was Mr. Delano in Ft. Wayne? A. No.

"Q. They were sent to him to be delivered to Bruegge? A. By mail or express, I have forgot.

"Q. Who did that? A. I did it, or my wife did it; I couldn't tell you.

"Q. Did you do it or your wife do it? A. I don't remember now whether that was the time I was sick or not; *if it was, my wife did it.*

"Q. When your wife wrote this letter of February 9,

were you a sick man then? A. Yes, she wrote it at my dictation.

"Q. It was about that time that the notes were forwarded? A. I think so."

Mrs. Bedard swore he was very sick, as we have seen; hence, there is no escaping the conclusion that she sent the renewal notes to Delano and was privy to the extension. Almost all the testimony introduced by the defendants was of an equivocal character and does not shake our belief that the court below was correct in its findings. If the wife knew of and assented to the extension, she is not discharged as surety. Barrett v. Davis, supra; Hallock v. Yankey, 102 Wis. 41; Neither is the land released from the incumbrance. McDonald v. Hulse, 16 Mo. 503; Lippold v. Held, 58 Mo. 213; Christian v. Newberry, 61 Mo. 446; Webb City Lumber Co. v. Victor Mining Co., 78 Mo. App. 676. Nothing short of payment will release the land, as was expressly decided in Lippold v. Held, supra. The property is still pledged for the payment of the debt. McCullom v. Boughton, 132 Mo. 601. We see nothing in the record which would justify us in disturbing the decree of the learned chancellor who tried the cause, but, to the contrary, are well satisfied with his decision. In doubtful chancery cases it is proper to defer to the finding of the trial court. Shanklin v. McCracken, 151 Mo. 587. Here there is no doubt. No rights of strangers have intervened, while the equities are overwhelmingly against the defendants.

The judgment is affirmed. All concur.