.POWELL *et al.* v. BANKS *et al.*, *Appellants*.

Division One, December 8, 1898.

1. **Conveyances:** DELIVERY: INTENTION. The delivery of a deed is largely a question of the intention of the parties, and whether or not it has been delivered is, generally speaking, a mixed question of law and fact.

2. ———: ———: ———: ACCEPTANCE. To give the delivery of a deed legal effect, the grantor must have intended its delivery, and the grantee have accepted it in its then condition.

3. ——: ——: ——: EXECUTION BY ONE OF TWO GRANTORS. Where a deed of trust was prepared for execution by a husband and wife, and it was understood by him and the grantee (a bank) at the time that it would remain with the bank's notary until his wife came in and signed it, and it is manifest that all parties intended that it was not to be complete without her signature, and contemplated at the time he signed it that something further toward its execution besides his signature was to be done, but it was nevertheless put of record by the bank officers without her signature, it will be held that the deed was not delivered or accepted, and that he was not bound thereby.

4. Deed of Trust: ALTERATIONS: EVIDENCE. The purpose of an expected mortgage was to have G. L. Yeater, who was surety on J. S. Banks' matured note, released, and Addie Banks substituted as surety in his place on a new note and its payment secured by a mortgage on her land. The deed of trust as first drawn described a note signed by J. S. Banks, H. B. Scott and G. L. Yeater. J. S. Banks signed the mortgage, but Addie would not. The deed of trust was altered to describe the note signed by J. S. Banks, H. B. Scott and G. L. Yeater, and put of record. It is held that the circumstances and evidence clearly show that the alteration was made by the mortgagee after J. S. Banks had executed the mortgage, and therefore such alteration rendered it invalid.

5. ——: NULLIFYING ALTERATION. Any change in a contract nullifies the instrument, except such as come under the distinction of spoliation by a stranger, or the filling of blanks purposely left or authorized to be filled. (Following, *Kelly v. Thuey*, 143 Mo. 422).

6. Parties to Action: STRICKEN OUT AFTER JUDGMENT. Where a party has no interest in the suit, is neither a necessary nor proper party, but through inadvertence has been made a plaintiff, it is not error to permit an amendment of the petition after judgment, by striking out her name, nor to strike her name from the judgment. (R. S. 1889, sec. 2101).

*Appeal from Pettis Circuit Court.*—HON. RICHARD FIELD, Judge.

REVERSED AND REMANDED (*with directions*).

*John Montgomery, Jr., Sangree & Lamm* and *Geo. P. B. Jackson* for appellants.

(1) The deed of trust relied on by plaintiffs was not a perfect deed because it never was so delivered as

to give effect as a completed deed. *Hammerslough v. Cheatham*, 84 Mo. 20; *Huey v. Huey*, 65 Mo. 692; *Gruning v. Steele*, 122 Mo. 287; *Railroad v. Ilif*, 13 Ohio St. 252; *Hicks v. Goode*, 12 Leigh, 479; *Overman v. Kerr*, 17 Iowa, 490; *Brevard v. Neeley*, 34 Tenn. 169; *Conner v. Balwin*, 16 Minn. 175; *Hill v. McMichal*, 13 Atl. Rep. 886; *State ex rel. v. Porter*, 63 Mo. 212; *St. Louis P. Club v. Tegler*, 17 Mo. App. 571; *State v. McGonigle*, 101 Mo. 362; *Henderson v. Bondurant*, 39 Mo. 369; *Ayers v. Milroy*, 53 Mo. 516; *Wendlinger v. Smith*, 75 Va. 309; *Ramsey v. Otis*, 133 Mo. 85; *Provart v. Harris*, 150 Ill. 40. (2) The pretended deed of trust in favor of plaintiffs was void because of the unauthorized alterations made by the cashier of the Citizens' Bank. *Bank v. Fricke*, 75 Mo. 178; *Hood v. Taubman*, 79 Mo. 102; *Bank v. Nickle*, 34 Mo. App. 298; *Robinson v. Berryman*, 22 Mo. App. 510; *Bank v. Meyers*, 50 Mo. App. 157; *Evans v. Foreman*, 60 Mo. 449; *Bank v. Dunn*, 62 Mo. 79; *Moore v. Hutchinson*, 69 Mo. 429; *Bank v. Packing Co.*, 70 Mo. 643; *Transit Co. v. Sheedy*, 103 Pa. St. 492; *Perean v. Frederick*, 17 Neb. 117. The burden was on the plaintiffs to explain the alterations, and to show that they were made with the knowledge and consent of Mr. Banks. 1 Greenleaf on Ev. [13 Ed.], sec. 564; *Stilwell v. Patton*, 108 Mo. 360; *Paramore v. Linday*, 63 Mo. 63; *Smith v. Ferry*, 69 Mo. 142; *Patterson v. Fagan*, 38 Mo. 70. (3) Independently of and before the execution of the deed of trust to them, Mrs. Banks and the insurance company had an equity to be secured on the land in question which was superior to any lien which plaintiffs could acquire under their deed, even if it was valid. When Mrs. Banks incumbered her land, about April 1, it was agreed that her husband should secure her and the debt to the insurance company by a deed of trust on the land in controversy. This was a valid

contract, in equity, at least.    *Turner v. Shaw*, 96 Mo.
22; *Morrison v. Thistle*, 67 Mo. 596; *McLaren v. Mead*,
48 Mo. 115; *Fennison v. Fennison*, 46 Mo. 77; *Small
v. Field*, 102 Mo. 104; *Pitts v. Sheriff*, 108 Mo. 110;
2 Story Eq. Juris. [12 Ed.], sec. 1373; Schouler's
Husb. & Wife, secs. 391, 394 and 403; *Tate v. Austin*,
1 P. Will, 264; *Neimcenicz v. Gahn*, 3 Paige, 614;
*Pawlet v. Delaval*, 2 Vesey, 663; *Innes v. Jackson*, 16
Vesey, 356; *Hanford v. Bockbee*, 5 C. E. Green, 101;
*Hoxie v. Price*, 31 Wis. 82; *Livingston v. Livingston*, 2
Johns. Ch. 537; *Bornie v. Stonestreet*, 6 Ind. 418;
*Jones v. Jones*, 18 Md. 464; *Peiffer v. Lytle*, 58 Pa. St.
386; *O'Hara v. Dilworth*, 72 Pa. St. 397; *Steadman v.
Wilbur*, 7 R. I. 481; *Woodsworth v. Tanner*, 94 Mo. 124;
*McCollum v. Boughton*, 132 Mo. 601.    (4) It is imma-
terial whether plaintiffs knew of the subsisting agree-
ment between Mr. and Mrs. Banks or not.    It was still
superior to the lien they attempted to secure without
any consideration, other than their pre-existing debts.
2 Pom. Eq., sec. 749; *Bank v. France*, 112 Mo. 502;
*Skilling v. Bollman*, 73 Mo. 665; *Wine Co. Rinehart*,
42 Mo. App. 171; *Watson v. Prtg. Co.*, 56 Mo. App.
145; *Strauss & Co. v. Hirsch & Co.*, 63 Mo. App. 95;
*Crawford v. Spencer*, 92 Mo. 498; *Bank v. Bates*, 120
U. S. 556; *Goetzinger v. Rosenfeld*, 16 Wash. 392; *Als-
ton v. Marshall*,, 112 Ala. 638. (5) The first pretended
deed of trust to plaintiffs, of April 27, was merged in
the second one which they obtained from Mr. and Mrs.
Banks on April 28, and the latter, the only valid one,
recognized the deed to Mrs. Banks and the insurance
company as a prior lien to that given to plaintiffs.
*Mead v. Gray*, 78 Mo. 59; *Atkinson v. Augert*, 46 Mo.
515; *Dubuque Natl. Bank v. Weed*, 57 Fed. Rep. 513;
1 Jones on Mortg., secs. 848 and 856; Tiedeman Real
Prop., sec. 321; 2 Washburn Real Prop. [4 Ed.] 196;
*Forbes v. Moffatt*, 18 Vesey, 384; *Campbell v. Kights*,

24 Me. 332; *Judd v. Lukins*, 62 N. Y. 266. (6) The judgment was improperly rendered because of the death of the plaintiff, Mrs. Wharton, and when the same was brought to the attention of the court, the judgment should have been set aside in order that the case might have been revived and proceeded with according to law. *Gamble v. Daugherty*, 71 Mo. 599; *Sargeant v. Rowsey*, 89 Mo. 617; *Rogers v. Tucker*, 94 Mo. 346; Bliss on Code Pleading, sec. 441; Black on Judgments, sec. 204; *McLaran v. Wilhelm*, 50 Mo. App. 658.

*Barnett & Barnett, C. E. Yeater* and *W. S. Shirk* for respondents.

(1) The deed of trust relied on by plaintiffs' was a perfect deed so far as John S. Banks was concerned. It was so delivered by him as to give effect to it, as a completed deed. The fact that the instrument was originally prepared with the name of the wife written therein for the purpose of having her join her husband in its execution, and that she refused to sign same, does not render it an incomplete instrument so far as the said John S. Banks is concerned. *Stanley v. White*, 160 Ill. 605; *Hyne v. Osborne*, 28 N. W. Rep. 821; *Brooks v. Isabell*, 22 Ark. 488. *First*. John S. Banks the grantor acknowledged the deed of trust, and placed it in the hands of the grantees with no intention of retaking the possession thereof. There was nothing left for him to do before the deed should become operative, and no conditions remained to be performed by the grantees. The grantor had divested himself of all dominion over the conveyance, and this is the infallible test of delivery. *Sneather v. Sneather*, 104 Mo. 201; *Standiford v. Standiford*, 97 Mo. 231; *Vanstone v. Goodwin*, 42 Mo. App. 39; *Huiser v. Beck*, 55 Mo. App. 668;

*Croder v. Searcy*, 103 Mo. 97; *Devorse v. Snyder*, 60 Mo. 235; *Ells v. Railroad*, 40 Mo. App. 165; *Richmond v. Morford*, 30 Pac. Rep. 241.   *Second*. The delivery of the trust deed will be presumed from the fact of its having been placed in the possession of the grantee. 5 Am. and Eng. Ency. of Law, 447; *Scott v. Scott*, 95 Mo. 300.   (2) There were no alterations made which affected the validity of the deed of trust.   The uncontradicted evidence was that no alterations were made after Banks signed and acknowledged the instrument. Yet in the absence of evidence to the contrary the law presumes that the alterations were made prior to the execution of the instrument.   *Stillwell v. Patton*, 108 Mo. 352; *Holton v. Kemp*, 81 Mo. 561; *Paramore v. Lindsey*, 63 Mo. 63; *Lubering v. Kohlbrecher*, 22 Mo. 596; *Matthews v. Coalter*, 9 Mo. 705.

ROBINSON, J.—This is an equitable proceeding to establish the priority of a lien of a certain deed of trust made by J. S. Banks to J. D. Crawford, as trustee for the plaintiffs, on certain real estate situated in Pettis county, over another deed of trust made by said Banks for the joint benefit of the Mutual Benefit Life Insurance Company of Newark, N. J., to secure a debt to said company of Mrs. Banks, and to indemnify her on account of having mortgaged her land for the benefit of her husband.   Both deeds of trust cover the same land and bear date of April 27, 1893.   The latter trust deed, however, was put upon record before the former.   The amended petition upon which this cause was tried, as ground for relief, alleged that the deed of trust in plaintiff's favor was executed prior to the one under which defendants claim, but on the same day, and that defendants had actual notice of the prior execution of the deed of trust for the benefit of the

plaintiffs at the time of the execution of the deed of
trust in their favor, and that late in the afternoon of
April 27, 1893, and after the closing of the recorder's
office, the defendants, through their agent, induced
the deputy recorder to open the office, and thereupon,
"with the wrongful and fraudulent intent of depriving
plaintiffs of the just and prior lien that they were en-
titled to have on said real estate under and by virtue
of said deed of trust, filed in the manner aforesaid the
said deed of trust for the benefit of the defendants."
The petition further alleges that plaintiffs filed their
deed of trust on the morning of April 28, and that
the defendant, J. S. Banks, was utterly insolvent at
the time.

The answer of defendants, which was under oath,
after admitting the execution of the deed of trust to
them and the filing of the same for record, denied that
J. S. Banks executed the deed of trust set forth in the
petition in favor of the plaintiffs, or that plaintiffs had
recorded any such deed of trust, or that any such deed
was entitled to priority over the deed of trust in favor
of defendants, or that they used any improper means
to procure the recording of their deed, or that they had
any knowledge of plaintiffs' deed of trust. The answer
further averred that at the time defendants received
and recorded the deed of trust in their favor, no other
deed of trust had been executed or delivered to plain-
tiffs, but that the defendants, J. S. Banks and his wife,
did execute a deed of trust in favor of plaintiffs after
the execution and recording of and subject to, the deed
of trust in favor of the defendants, but that said deed
was executed and delivered to, and accepted by plaintiffs
on April 28, 1893, and thereafter recorded, and that the
same was given to plaintiffs for the purpose of securing
the debts described in the petition. The answer further
alleges that the deed of trust in favor of defendants

was executed and delivered on April 27, 1893, for a valuable consideration without any notice of the deed of trust in favor of the plaintiffs.

The evidence shows that Mr. Banks had been a man of considerable means, dealing largely in live stock and owned several farms in Pettis county and was greatly involved financially. It seems that several of the plaintiffs and Mr. Banks had been in the habit of mutually signing notes for each other. In addition to the money obtained in this way, he had borrowed a large amount of money and secured same by mortgages on all of his farms, but being desirous of raising more money, he made an application to the Mutual Benefit Life Insurance Company for a loan, but they refused to take a second mortgage. Mrs. Banks had inherited a considerable estate, and at this time owned a valuable farm near the city of Sedalia. This was wholly unincumbered and it was suggested that Mr. Banks could obtain a loan from the insurance company if he could secure it upon his wife's land. The land in question was known as the Groves & Yeater farm, and was already covered by a mortgage. Before this, however, Mr. Banks was contemplating the sale of the Groves & Yeater farm, and in that connection proposed to his wife that if she would mortgage her land to secure a loan of $6,000 from the insurance company, he would protect her with this land; that pending negotiations for the sale of this land, the matter would stand over and if he succeeded in selling he would pay off the incumbrance upon her land, otherwise he would give her a second mortgage upon the Groves & Yeater farm to secure the insurance company, and indemnify her against loss by reason of having mortgaged her land for his benefit. On April 1, Mrs. Banks, in conjunction with her husband, executed a deed of trust on her property in favor of the

insurance company, but nothing seems to have been done towards carrying out the agreement to secure her until the twenty-seventh day of April. On that day Banks and his wife executed a deed of trust to J. C. Thompson as trustee, for the benefit of the insurance company and Mrs. Banks. This deed recited the making of the deed of trust by Mrs. Banks upon her own land in favor of the insurance company and the agreement for security by a second deed of trust upon her husband's property, and that the deed of trust then made was in pursuance of that agreement, and provided among other things that the insurance company should first resort to the land of Mr. Banks and not sell Mrs. Banks' land except to make good any deficiency that might arise on the sale of the land of Mr. Banks. This deed of trust was acknowledged about 5 o'clock in the afternoon of that day, and then delivered to Mr. McClure, a nephew of Mr. Banks, for the use of the beneficiary, and was by him filed for record that evening. The recorder's office having been closed before McClure reached there, he procured one of the deputy recorders with whom he was acquainted, to go with him to the office and file the deed of trust that evening. It appears that McClure knew that Mr. Banks was largely indebted and was being pressed by his creditors, and that there were threats to attach his property and not understanding the effect of all these things, he deemed it best under the circumstances to put the deed on record that evening.

The plaintiffs were holders of, and sureties upon, several different notes of Mr. Banks. Yeater, the surety upon a note of $4,500, was insisting upon being relieved from his liability as such surety and the officers of the Citizens National Bank, and others, had sometime prior to the twenty-seventh of April, undertaken to induce Mrs. Banks to sign this note in lieu

of Yeater. Mr. Banks, in order to relieve himself from the importunities of some of his creditors, had acquiesced in this suggestion. During these negotiations, several visits had been made to the home of Mr. Banks, by the bank officials and others, but Mrs. Banks hesitated about incurring this responsibility. On April twenty-seventh Mr. Banks, who had just recovered from a spell of sickness, went to Sedalia and called at the Citizens National Bank. While there, he was requested by the president and cashier of the bank, to give a deed of trust upon the land in question to secure the notes above referred to. Thereupon he signed the deed of trust that was presented to him, and acknowledged the same before Mr. Ware, a notary public and an employee of the bank, with the understanding that the deed, which was prepared for the execution of Mrs. Banks also, should remain with the notary until his wife came in and acknowledged it. In this connection it will be observed that the note upon which Yeater was surety bears date October 13, 1892, and matured in six months thereafter. A renewal note was prepared and dated April 13, 1893, maturing in October following. This note was signed by Banks as principal, and Scott the other surety, and it was contemplated that Mrs. Banks would sign it in lieu of Yeater, and in this way discharge the Yeater note. Defendants objected to the introduction of the deed of trust under which plaintiffs claim, for the reason that its execution was denied under oath and because there were plain and unmistakable alterations and changes therein. These objections being overruled and the deed of trust admitted in evidence, the defendants excepted. At the time Mr. Banks signed and acknowledged the deed of trust in favor of plaintiffs and left it for further execution by his wife, the deed was drawn and conditioned to secure a note for $4,500, dated

April 13, 1893, upon which Addie Banks and H. B. Scott are sureties. It appears that the date has been changed from April, 1893, to October 13, 1892, and that the name of Mrs. Banks as surety has been erased and that of G. L. Yeater substituted in its place. There is also a change in the description of the land, and the certificate of acknowledgment has been so altered as to change it from husband and wife to that of a man acknowledging without his wife. As Mrs. Banks did not go to the bank to complete the execution of the deed of trust as expected, the cashier of the bank, Mr. Powell, and Mr. Scott, the surety, went out to the residence of her sister, Mrs. Morrison, with whom she was stopping, and had an interview with her late that afternoon touching her signing the $4,500 note in place of Yeater. Shortly after signing the deed of trust under which plaintiff's claim, Mr. Banks was taken over to Mrs. Morrison's by McClure, who happened to be passing in a buggy. In course of a conversation on the way there, Mr. Banks informed McClure what had taken place relative to his signing of a deed of trust to the plaintiffs. The agreement between Banks and his wife about securing her, by a deed of trust, was also referred to. When they reached Mrs. Morrison's, Mr. Banks told his wife that he was going to execute the necessary deed of trust to secure her. Nothing, however, was said to or in her presence in regard to the deed of trust in favor of the plaintiffs. Thereupon the deed of trust in favor of the insurance company and Mrs. Banks was prepared by George P. B. Jackson, Esq., an old acquaintance of the Bankses and to whom the agreement between Mr. Banks and his wife above referred to had been previously explained, and the acknowledgment of Mr. and Mrs. Banks taken about 5 o'clock in the afternoon of that day. The interview that Powell and Scott had at

Mrs. Morrison's that afternoon with Mr. Banks and wife took place after the execution of the deed of trust last referred to. The deed of trust was filed for record at 7:40 p. m. of that day. About 8 o'clock on the following morning, Powell met the recorder on the streets of Sedalia and asked him if there had been any instrument filed affecting the property of the Bankses, and was informed there was none. Thereupon Powell gave the recorder the deed of trust signed by Mr. Banks the day before, and requested him to file it for record, which was done accordingly. Soon thereafter the recorder ascertained that a deed of trust in favor of Mrs. Banks and the insurance company had been filed for record the day before, and immediately notified Powell, who went to the recorder's office and endeavored to withdraw the deed of trust which he had filed that morning, saying that he wanted to get Mrs. Banks to sign it; but as the deed had been indexed, the recorder would not allow him to withdraw it and thereupon he took a copy of it. He then went to the Banks residence near Sedalia in company with Scott and Mr. Ware, the notary public, and there produced another deed of trust which he had prepared, and sought to induce Mr. and Mrs. Banks to execute it. At the time the latter deed of trust was presented, Powell was informed that the day before, Mr. Banks, in conjunction with his wife, had given a deed of trust to Mrs. Banks and the Insurance Company, but that they would execute the proposed deed of trust if Powell would insert a clause therein, making the lien of the bank subject to the deed in favor of Mrs. Banks. This was finally agreed to, and interlineations made accordingly and then the same was signed and acknowledged by Mr. Banks and his wife before Mr. Ware, a notary public, and filed for record on April 28, 1893, at 11:20 a. m. The debts secured by the

deed of trust in favor of the plaintiffs all existed prior to the making of said deed. Some of them were already past due, none of them, however, were either made or extended in consideration of such deed of trust.

On this state of facts the circuit court found in favor of the plaintiffs and defendants appeal to this court.

I. The defendants contend that there was no delivery, in contemplation of law of the deed of trust under which plaintiffs claim. In other words, that the deed was signed by Mr. Banks and left at the bank not to be delivered in its then condition, but to be completed and delivered if his wife came in and signed it. On the other hand the plaintiffs insist that the deed in question was a perfect one so far as Mr. Banks was concerned, notwithstanding the instrument was originally prepared for the joint execution of both Mr. Banks and his wife, and she failed to sign the same. At the outset it might be observed, that delivery of the deed of trust relied on by plaintiffs is essential to their right of action. While this is true, no particular form or course is necessary to constitute a legal delivery. The authorities all agree that the delivery may be accomplished in various ways. While ordinarily to give legal effect to a delivery, especially as between parties, the deed must be complete in itself and ready for delivery, yet, after all, the question of delivery rests largely in the intention of the parties, and generally speaking, whether or not an instrument has been delivered, is a mixed question of law and fact. It may be further said, also, that delivery must usually be accompanied with acceptance by the grantee, which under certain circumstances may also be implied. But to give the delivery of a deed legal effect, the grantor must have intended its delivery, and the

grantee have accepted it in its then condition.   All the cases cited in the briefs on both sides, agree on these general rules, but as will be seen from an examination of the authoriteis, they differ somewhat in their appli- cation to the particular facts.   In 2 Greenleaf on Evi- dence [15 Ed.], sec. 297, the rule is thus stated: "The delivery of a deed is complete when the grantor has parted with his dominion over it, with intent that it shall pass to the grantee, provided the latter assents."

In *Crowder v. Searcy*, 103 Mo. 117, GANTT, P. J., who wrote the opinion says:    "The whole object of a deliv- ery is to indicate an intent upon the part of the grantor to give effect to the instrument.". In 3 Washburn on Real Property [4 Ed.], page 292, it is said:   "The act of delivery and acceptance must, from the nature of the case, be mutual and concurrent acts. . . . . . . . Acceptance by the grantee is an essential part of a delivery.  Proof of an acceptance, at a time subsequent to that of the act of delivery, would not be sufficient to give validity to the deed, unless the act of delivery be a continuing one in its nature, such as leaving a deed on deposit to be accepted by the grantee at his elec- tion. . . . . . . . It is an essential pre-requisite, that the instrument in question should be understood by the parties to be completed and ready for delivery, in order to have a mere placing it in the hands or pos- session of the grantee or his agent construed into a delivery. . . . . . . . While, therefore, it is not com- petent to control a deed by parol evidence, where it has once taken effect by delivery, it is always competent, by such evidence, to show that the deed, though in the grantee's hands, has never been delivered."

Plaintiffs also seek to invoke these presumptions in aid of their case, that the possession of an instru- ment by the grantee, unexplained by any other cir- cumstances, is presumptive evidence of delivery, as the

recording of a deed is likewise *prima facie* evidence of delivery and acceptance.

Clearly, when it is said that the delivery of an instrument is complete when the grantor has parted with his control over it with intent that it shall pass to the grantee, it is meant that the grantor's intent is to deliver the instrument in the condition in which it is at the time, also that the grantees assent thereto.

On the question of delivery, Mr. Powell testified that about 2 o'clock in the afternoon of April 27, Mr. Banks came into the Citizens National Bank of Sedalia, and after some conversation touching his indebtedness, the witness presented the deed in question, which had already been written up by Col. Crawford, vice-president of the bank, whereupon Mr. Banks signed and acknowledged it before Mr. Ware, a clerk of the bank who was also a notary public. At the time the deed was signed by Mr. Banks, it was upon a desk in front of which Ware was standing at work. At the time the deed was acknowledged by Mr. Banks, he stated to Mr. Powell and the notary public that his wife would come in and sign and acknowledge the deed. Banks went out and left the deed lying on the desk and the witness testified that he fully expected Mrs. Banks to come in and sign it. The deed remained in the bank until about 5 o'clock in the afternoon awaiting Mrs. Banks, who it seems did not come in as contemplated. The witness then took the deed of trust and went out to the residence of Mrs. Morrison, with a view of inducing Mrs. Banks to sign the same out there.

Mr. Ware, the notary public, testified that Mr. Banks signed and acknowledged the deed of trust before him at the bank about 2 o'clock in the afternoon of April 27, that he did not fill out the certificate of acknowledgment at the time because he was

waiting for Mrs. Banks to come in and sign and acknowledge the same.   This witness thought that perhaps the deed was given to Mr. Powell, although it might have remained in his possession; he did not remember definitely as to that; that the changes made in the certificate of acknowledgment were in the handwriting of Powell; that all the witness wrote was his own name, his official signature and the date of the expiration of his commission; that Powell made the alteration above referred to and then told the witness to certify to Banks' acknowledgement, and then Powell took the deed and left the bank.   This was about 5 o'clock in the evening.   The witness did not see Mr. Powell any more that day after leaving the bank.   Mr. Hutchinson, president of the bank, testified that at the time the deed was signed and acknowledged by Mr. Banks, they (referring to the bank officers) expected Mrs. Banks would be in the bank during the afternoon and complete the execution of the deed of trust; that Powell placed the deed on the desk in the front room and Mr. Banks stepped up to the desk and signed and acknowledged it before Mr. Ware, but that Ware did not certify to it at the time, as he was waiting for Mrs. Banks to sign and acknowledge it also.   That he became impatient because Mrs. Banks did not come and complete the execution of it, and before the close of banking hours went to Scott's lumber yard to inquire for Mrs. Banks.   Later on when going home he met Mr. Banks and McClure in a buggy, and inquired of him whether his wife was coming in to sign the deed of trust, to which he says Banks replied that he was looking for her.   The witness supposed that Banks was going to find his wife and take her up to sign the deed.

Mr. Scott, who was Mr. Banks' security on a portion of the debt sought to be secured by the deed of

trust in controversy, testified that he went into the bank at half past three in the afternoon of April 27, and was informed by Mr. Hutchinson that Mr. Banks had been in and signed the deed of trust and left it there to be signed by his wife. The witness then returned to his lumber yard and about 5 o'clock in the evening of that day, Mr. Powell came down there and said that Mrs. Banks had not been up yet to sign the deed of trust, and asked the witness to go with him to Mrs. Morrison's for the purpose of having Mrs. Banks sign the deed of trust, and also the note on which he was surety.

The recorder of deeds testified that he met Powell as he was going to his office on the morning of the twenty-eighth of April, and that Powell asked him if any instrument made by Banks had been filed for record; that he informed him that nothing had been filed up to the closing of his office the day before. Thereupon Powell gave the deed of trust in question to the witness who took it to his office and marked it filed. Shortly afterwards the witness discovered that the deed of trust in favor of Mrs. Banks had been filed the evening before and notified Powell accordingly by telephone who immediately came to the recorder's office and requested the recorder to let him withdraw the deed, assigning as a reason therefor, that he "wanted Mrs. Banks to sign it."

Mr. Banks testified that a few days before the twenty-seventh of April, Powell and Hutchinson, accompanied by Ware, the notary public, came out to his house and said to him that Yeater was vigorously objecting to renewing the $4,500 note in the bank on which he was surety. Banks, who was just recovering from a long spell of illness, told them that he was too feeble and weak to transact any business at that time but for them to go back and inform Yeater that "he

had been on notes for him time and again, and had said naught against him, and for him to be quiet and as soon as he was able he would come in and fix it in some way." On the following morning they came back again and told the witness they had come to see him again about the Yeater note; that they had seen Yeater and delivered his message, but he refused to be satisfied, and they wanted tō see if he could not arrange it is so as to release Yeater in some way. Thereupon they produced a deed of trust already prepared, which he declined to execute, saying for them to go back and tell Yeater he would arrange to release him as soon as he was able to go to town, and if necessary he would get his wife to sign the note; that he would be in town "to morrow or next day." The next day, although very feeble and weak, he and his wife drove to town in a buggy. About 2 o'clock in the afternoon, the witness went to the bank, where he met Powell and Hutchinson, the latter asked him if he did not think he had better secure these parties; that Yeater was doing considerable talking about his financial embarrassment, which was calculated to impair his credit and it would be better to fix the matter up, and said, "If you will sign this deed of trust, and want to feed cattle this fall, if the bank hasn't the money to furnish you, I will furnish it myself." After some further conversation, the deed of trust in dispute was produced and witness signed it, saying he would also get his wife to come around and sign it later on. When the notary took his acknowledgment the witness said, "Mr. Ware, you can hold this till my wife comes in to sign it." After remaining there about half an hour he went over to the First National Bank and was driven from there later in the afternoon by his nephew to Mrs. Morrison's where his wife was then stopping for the day.

A careful examination of all the testimony bearing upon the question of the execution and delivery of the deed of trust in question, shows beyond a doubt that all the parties intended that the deed of trust was not to be considered as complete in its then condition, but was left with the notary at the bank to be fully completed if Mrs. Banks came in and signed it. It is manifest that the parties contemplated something further would be done toward the completion of the execution of the deed of trust than the mere signing and acknowledging of it by Mr. Banks himself. When Banks signed the deed it was evidently expected that Mrs. Banks was to come in and sign both the deed of trust and the note in renewal of the Yeater note, which was one of the debts secured thereby. Under these circumstances how can it be said that the intention was to deliver the deed without her signature.

It was doubtless fully intended that the deed of trust was to be signed and acknowledged by Mrs. Banks before being certified by the notary, and was therefore left with the notary for certification, in case she signed it, and although it was in the bank of one of the plaintiffs, that did not constitute a delivery. No certifiate of acknowledgment had been indorsed upon the deed at this time. It was clearly within the minds of the parties interested in the matter that the deed was to be signed by Mrs. Banks before being certified by the notary public. Clearly then there was no delivery or acceptance at that time in the absence of the signature of Mrs. Banks.

Moreover Powell himself testified that late in the afternoon of the twenty-seventh of April, he took the deed from the desk where it had been left, and in company with Mr. Scott went over to Mrs. Morrison's where she was stopping and sought to procure her

signature to the deed as well as the note.   In this,
however, he was unsuccessful, and left without
securing her signature to either the deed or the note.
Even then he did not entirely give up, but still
hoped that she would sign the deed, and evidently
expected her to call at the bank on the following
morning and complete the execution of the deed
of trust.   The officers of the bank clearly intended up
to this time to have the deed of trust executed by both
Banks and his wife and continuing in that state of
mind evidently carried the matter over until the morn-
ing of the twenty-eighth, for the purpose of having the
transaction carried out on these lines.   Becoming appre-
hensive later on, that things were not just right, Powell
concluded on the morning of the twenty-eighth to record
the deed of trust without first having it signed by Mrs.
Banks.   Before doing so, however, he inquired of the
recorder if any deeds had been filed against Banks' prop-
erty the evening before.   On being informed by the re-
corder shortly after filing the deed in question that the
deed to Mrs. Banks had been filed on the evening before,
he saw that the advantage sought to be gained by filing
the deed of trust in its incomplete condition had been
defeated by the deed under which defendants claim,
and accordingly undertook to withdraw the deed of
trust which he had filed, and proceeded to carry out the
original intention of the parties by having the deed
completed through the execution of it by Mrs. Banks.
This, however, he could not do, as the deed had already
been indexed and the recorder would not permit it to
be taken from his office.   When he found that he
could not obtain the deed of trust he had filed, he pro-
cured a copy of it and went to the home of the Bankses
on the morning of the twenty-eighth, to have them
sign it in the condition as it was when he had it re-
corded securing the bank's indebtedness, as it stood

without the name of Mrs. Banks on the $4,500 note as originally contemplated in lieu of Yeater.

In course of the conversation relative to the execution of a second deed of trust, Powell was informed of the deed to the insurance company and Mrs. Banks. They declined to sign or complete the execution of this deed of trust unless it was made subject to the prior lien of her deed. These conditions were acccepted by plaintiffs without qualification, and interlineation was made in the deed accordingly. At this time the plaintiffs did not consider the deed of trust in controversy as giving them any priority or advantage, and made no claim for such whatever, under the latter deed. When the officers of the bank started out on the morning of the twenty-eighth to procure Mrs. Banks' signature to the deed, they undoubtedly regarded the matter as unfinished business. This record certainly does not disclose any evidence of an intention to differentiate between the first and second deed of trust, nor to claim priority over the deed of trust relied on by the defendants. Looking at the acts of all the parties to the transaction, when considered in the light of the rule which people of fairness and candor, similarly situated, would ordinarily apply in respect to the matter in hand, our conclusion is that the deed of trust in question was not delivered so as to give it effect as a completed deed. Consequently we are unable to concur in the finding of the circuit court, as was necessary to the decision below, that there was a delivery of the deed to Mr. Powell on the evening of the twenty-seventh of April.

2.    It is further objected that the deed of trust relied upon by the plaintiffs was void because of the unauthorized alteration made in it by Mr. Powell, cashier of the Citizens Bank. As previously stated, the instrument in controversy was drafted by Col. Crawford,

vice-president of the bank.    The evidence shows that
the deed was originally written to secure a note dated
April 13, 1893, maturing six months from the date
thereof, with Addie Banks and H. B. Scott as sureties,
and that the date of the note and names of the sure-
ties were so altered that the deed, when read in evi-
dence, appeared to secure the original note signed by
Geo. L. Yeater and H. B. Scott, instead of Mrs. Banks,
and dated October 13, 1892, due six months from that
date.    It is admitted that the alterations in the deed
were made by and in the hand writing of Mr. Powell.
But plaintiffs insist that such alterations were made be-
fore the deed was signed by Banks.    Mr. Banks testi-
fied that the alterations now appearing in the deed
were not there when he signed it.    Opposed to this
view, however, is the bald, naked statement of Mr.
Powell in which he testifies that the alterations were
made before the deed was signed by Mr. Banks.    But
when we come to consider the whole of the testimony
developed by this record, it will be seen that Yeater,
who with Scott was surety on the note above men-
tioned, was strenuously insisting upon being relieved
from his obligation thereon and was doing consider-
able talking which was calculated to injure Mr. Banks'
financial standing, and that he had been advised by
both Powell and Hutchinson to so arrange matters as
to release Yeater and thus put an end to his agitation,
and in this connection it had been proposed that Mrs.
Banks would sign said note in lieu of Yeater, and Mr.
Banks had agreed to prevail upon his wife to sign the
note.    With a view of carrying out this arrangement a
new note was prepared by the bank officials and signed
by Scott and Mr. Banks, and six months' interest paid
thereon.    The evidence further shows that Mr. Banks
signed the deed of trust at the Citizens' Bank about

2 o'clock in the afternoon of the twenty-seventh, and that it remained upon the desk where signed, until after the close of business hours in the evening, awaiting the signature of Mrs. Banks, whom it was confidently expected would come in during the afternoon and sign the same.    Failing to do so Powell and Scott went out to her sister's residence late in the evening with the view, as they said, of inducing her to sign the deed. The question of her signing the note was also discussed at that time.    Indeed Banks and McClure both testified positively that the matter of her signing the note was the only question talked about at that meeting.    Be that as it may, however, it is conceded on all hands that the subject of signing the note in question by Mrs. Banks was brought up and talked of in that conversation.    Now, if the alterations were made before Banks signed the deed and before Powell read it to the persons at Mrs. Morrison's house, as he testified he did, it is very strange indeed that they should discuss the question of her signing the note in lieu of Yeater when that plan had been abandoned and Powell was seeking to secure the Yeater note instead.    The evidence establishes conclusively that a renewal of the latter note had been substantially agreed upon and arranged for, and a renewal note signed by all the parties except Mrs. Banks and a deed of trust prepared, conforming to the intensions of the parties for the purpose of carrying out that arrangement; that such was the expectations of the parties is further shown by the deed of trust as originally prepared by Col. Crawford, which secured the note of April 13, to be signed by Mrs. Banks.    Clearly Powell had not abandoned his hopes of having the deed and note signed by Mrs. Banks at the time he and Scott were at Mrs. Morrison's, about three hours after the deed had been signed by Mr. Banks.

Up to this time it would have been clearly contrary to the intention and purposes of the parties to have made any alterations in the deed from the way it had been originally prepared. The making of such alterations at that time would have operated to defeat the very purpose to be accomplished by the deed of trust to be executed. Besides, Powell himself had not finally given up hopes of Mrs. Banks signing these papers when he left Mrs. Morrison's that evening. He says that she promised to think it over and might come in the next morning and sign the papers. Accordingly he waited until the following morning in the expectation that Mrs. Banks would come in and sign these papers, but for some reason he began to suspect that all was not right, and filed the deed to secure such notes as the bank then held and that had been signed by all the required parties. In view of the testimony above referred to it is unreasonable to suppose that the alterations in question were made before Banks signed the deed. Consequently we can not agree with the circuit court in holding that the vitiating alteration was made before the deed of trust had been signed by Mr. Banks. The testimony affords convincing proof that after it was found that Mrs. Banks would not sign the renewal note, the deed of trust was altered by Powell so as to make it secure the Yeater note, and afterwards filed for record in its present condition, and this too without the knowledge or consent of Mr. Banks. The rule is well settled in this State that any change in a contract nullifies the instrument except such as come under the distinction of spoliation by a stranger, or the filling in of blanks purposely left or authorized to be filled. This view of the matter was taken by the court *in banc* in the recent case of *Kelly v. Thuey*, 143 Mo. *loc. cit.* 434. There it was said: "We have always regarded and still regard any change on the face of the paper, as a

nullifying alteration." This case is exactly in point. There, as here, the alterations complained of was in a different handwriting written with different ink from the balance of the instrument. Under these circumstances the court held that it devolved upon the plaintiff to explain the alterations. Applying the rule laid down in that case, to the case at bar, it will be seen that aside from the question of the delivery of the deed of trust in dispute, the plaintiffs are debarred from recovery by reason of the unauthorized alterations made in the deed after the same had been signed by Mr. Banks.

3. It is also urged that the circuit court erred in permitting the amendment which was made in the petition and judgment, after the rendition of judgment, by striking out the name of Mrs. Wharton, one of the plaintiffs, when it was disclosed that she was dead, at the time the case was tried and judgment rendered therein. The record on this point shows that the note to which Mrs. Wharton was a party, had been paid long before the commencement of the suit and that she had no interest in the suit and was neither a necessary nor a proper party but through inadvertence had been improperly joined as a party plaintiff. Under these circumstances the court committed no error in permitting her name to be stricken out of the petition and judgment. R. S. 1889, sec. 2101.

We have examined the other points discussed in the briefs of counsel, but in the view we have taken of the case it is unnecessary to pass on those questions. For the reasons above stated the decree below will be reversed, and the case remanded to the circuit court with directions to enter judgment establishing the priority of the deed of trust under which defendants claim, and adjudge the deed of trust relied on by plaintiffs to be void. WILLIAMS and MARSHALL, JJ., concur. BRACE, P. J., concurs in result.