SHANKLIN V. MCCRACKEN *et al.*, *Appellants.*

In Banc, June 29, 1897.

**Evidence:** TESTIMONY BY WIFE ON BEHALF OF HUSBAND.  Where the vital question in a case is whether certain deeds were delivered to the grantee, his wife is a competent witness to testify concerning the things she saw connected with such delivery, and she is competent to detail all knowledge she derived wholly by the exercise of her sense of sight alone, but she is not competent to testify concerning conversations or admissions made by him at the time, whether made to her or to third parties; and such ruling is not in conflict with section 8922, Revised Statutes 1889.

*Appeal from Grundy Circuit Court.*—HON. PARIS C. STEPP, Judge.

REVERSED AND REMANDED.

*George Hall* and *C. H. S. Goodman* for appellants.

(1)  None of the numerous cases in which section 8922 has been construed by this court sustain the action of the trial court. *Berry v. Hartzell*, 91 Mo. 132; *Moore v. Moore*, 51 Mo. 118; *Entwhistle v. Feighner*, 60 Mo. 214.  (2) The wife was competent as to any fact which she did not learn from her husband. *Stein v. Weidman*, 20 Mo. 17; 29 Am. and Eng. Ency. of Law, 630.  Her testimony as to what she saw would violate no rule of marital confidence.  When admonished not to state any part of the conversation which passed in her hearing, she could with as much propriety testify to any gesture or motion of her husband as if she had been out of earshot or totally deaf.  It may be urged that if this testimony had been admitted it could not have changed the result, but this assumption is wholly inadmissible.  The exclusion of relevant

testimony is almost always a material error; and the same rule prevails in equity cases as in cases at law; otherwise objections to the introduction of incompetent evidence, or exceptions to the action in excluding competent evidence, would be merely idle forms. 'Where the evidence as to a particular issue is seemingly equally poised, the exclusion of competent evidence, however slight, is prejudicial error. Elliott's Appellate Procedure, sec. 670.

*Hugh C. Smith, A. W. Mullins* and *J. H. Shanklin* for respondent.

(1) The circuit court did not err in ruling that Mrs. Catherine McCracken, widow of John A. McCracken, was not competent to testify as to acts claimed by the defendants to have occurred between James McCracken and said John A. McCracken. The law in this State is well settled that "the wife is not a competent witness to prove what is said in a conversation by another person with her husband, nor to prove any act done in connection with such conversation and which might be explained thereby." *McFadin v. Catron et al.*, 120 Mo. 252, 274; *Holman et al. v. Bachus*, 73 Mo. 49; *Moore v. Wingate*, 53 Mo. 398; *Waddle v. McWilliams*, 21 Mo. App. 298; *Willis v. Gammill*, 67 Mo. 730, 731; 2 R. S. 1889, sec. 8922, last clause.

BRACE, J.—This is a suit in equity to set aside three deeds, signed, sealed, and acknowledged by James McCracken on the nineteenth of June, 1888, and thereafter duly recorded, conveying certain real estate in Grundy county, described in the petition, to his father, John A. McCracken, on the ground that said deeds were made without consideration, with the intent to hinder, delay, and defraud the creditors of

the said James; and were never delivered to the said John A. McCracken, since deceased, whose widow, administrator and heirs at law are the defendants herein.

It 'appears from the evidence that at the time the deeds were made the said James McCracken was indebted to his father in the sum of about $2,000, *unsecured*, and in like manner was indebted to Shanklin & Austin, bankers of Trenton, Missouri, in about the sum of $3,000, besides other *secured* indebtedness. ' Of the business of the firm of Shanklin & Austin, composed of John H. Shanklin and William E. Austin, the said William E. Austin was the active manager; he was also the friend and business adviser of the said James McCracken. On the third of October, 1888, Shanklin & Austin made an assignment to Nathaniel and Walter Shanklin, and thereafter said assignees instituted suit against said James McCracken to recover the amount of his indebtedness to Shanklin & Austin at that date; and on the third day of May, 1890, obtained judgment thereon against said James McCracken for the sum of $7,849.11 upon which execution was thereafter issued, under which the premises were sold, and the plaintiff, Nathaniel Shanklin, became the purchaser thereof at the price of $1,000 and received a sheriff's deed therefor, and holds the title thus acquired in trust for the said concern of Austin & Shanklin. Afterward, at the December term, 1892, of the circuit court of Grundy county, the present suit was instituted, which resulted in a finding of the issues for the plaintiff, and in a decree setting aside the deeds, and vesting James McCracken's title in the plaintiff, from which decree the defendants appeal. The evidence further tended to prove that at the time the deeds in question were made the said James McCracken was having serious trouble with his wife,

and that both he and his said creditors were desirous of his making some disposition of his real estate that would relieve it of her inchoate right of dower, in view of the probable action she might take against him and his property, and thereby protect the same for the benefit of himself and his creditors. In order to accomplish this purpose it was necessary that deeds should be made in which James McCracken's wife should join, relinquishing her dower, conveying his lands to some third person. This she consented to do upon payment to her of $700 by James McCracken, and they were accordingly so made to his father, after consultation with and advice from the said William E. Austin as to the proper course to be pursued. A short time after the deeds were made they were placed by James McCracken in his pocket book, called a banker's case, in which he kept his papers for safety, at the bank of Shanklin & Austin, where they remained until some time after the death of his father (who died September 4, 1889), when they were taken away by James McCracken, and some time thereafter they were filed for record by the administrator of John A. McCracken, and recorded.

It was admitted on the trial by the defendants "that the deeds in controversy were made by James McCracken to John A., his father, in good faith as security for the indebtedness that James McCracken owed to his father at the time, and were not intended as absolute conveyances." W. E. Austin, who was introduced as a witness on the part of the plaintiff in the course of his examination, testified as follows: "I think I know all about the deeds that were made by James McCracken and wife to his father. They were made on account of his wife and himself having trouble and to get the title out of her, and were put in the pocket book there with my knowledge and the agree-

ment between him and his wife was left with me by the attorneys. These papers were put in the bank in my custody in 1888, in the fall or summer, and remained there until some time in 1890. . . I knew beforehand that they were about to be executed. . . I learned from James McCracken that the deeds were about to be executed . . . I advised him to get the title out of his wife if he could. I did not advise him where to put the title or suggest any person to whom the deed should be made . . . I permitted this deed which conveyed all of Jim's property to the old man to be made without objection, but I was surprised when the administrator caused it to be put on record.

"*Q.* What was the occasion of the surprise, if you knew of its existence? *A.* Because the deed was not intended for the old man at first; it was intended to secure his indebtedness to me as well as to the old man.

"*Q.* Were you mentioned in the deed? *A.* We expected for the old man to fix up the entire indebtedness, so he could handle the land himself. We didn't want the land.

"*Q.* It was conveyed to the old man for the purpose of paying the entire amount of Jim's indebtedness to you and everybody else? *A.* Yes, sir; and Jim endeavored to get a loan on the farm for that purpose. That was my understanding of the matter.

"*Q.* That the conveyance was made to the old man for the purpose of securing the whole of Jim's indebtedness? *A.* No, sir; for the old gentleman to get the title.

"*Q.* What did you say a moment ago—that it was for the purpose of securing indebtedness? *A.* The wife wouldn't sign the deed of trust, and these deeds were not delivered, and didn't intend to be made out

until their papers were made out; that is, to get an eastern loan if he could. Jim was to get it.

"*Q.* How could Jim get an eastern loan with the title in the old man? *A.* It was not in the old man.

"*Q.* If this title was in the old man by virtue of this deed, how could Jim get a loan on the land? *A.* I stated before the deed had not been delivered.

"*Q.* If not then he couldn't get a loan with any greater facility than he could before. His wife still stood in the way if the deed had not been delivered? *A.* If he got the paper from the old gentleman these papers could have been placed on the record.

"*Q.* The intention was these deeds could be placed on the record? *A.* After he secured an eastern loan.

"*Q.* Was his wife to join in that loan? *A.* I don't know.

"*Q.* You can't explain how it was that this deed was executed for the purpose of getting an eastern loan? *A.* I stated why the deeds were given.

"*Q.* Yes, sir; to get rid of his wife's interest in the land. After the deed was executed extinguishing the wife's title, then Jim was to get an eastern loan? *A.* Yes, sir; that was my understanding.

"*Q.* Was it the understanding that his wife was to get a divorce? *A.* I don't know anything about that.

"*Q.* How could Jim mortgage this land with the title in the old man? *A.* I told you what I understood about it; that if Jim could secure an eastern loan he intended to get a paper or deed from his father, I suppose it would take, and have it re-conveyed to him; and secure his loan that way, so that he could handle the land."

He further testified to a talk with James McCracken had in 1890, as follows: "It occurred in Mr. Harber's office. Mr. Harber and myself and

Vol. 140 mo—23

Nathaniel Shanklin were present.   We were trying to get a settlement out of him and Mr. Harber asked him first, 'Have those deeds ever been delivered?' and he said, 'No, they have not.' "

*Nathaniel Shanklin* testified to the same effect as did also Mr. Harber.

*James McCracken,* who was introduced as a witness on the part of the defendants, in the course of his examination, testified as follows:   "The circumstances under which the deeds were executed were these:    I was having trouble with my wife, and I wanted to get rid of her in a property way.   Owing to this trouble my father and mother both insisted on my making them a deed of trust for what I owed them and which I had put off from time to time.   I executed the deed to get my wife's dower out of it and to secure my father for what I owed him, and I made the deeds and delivered them to him instead of the deed of trust. My father requested a deed of trust and I made the deed and gave it to him in lieu of the deed of trust, and made it as a warranty deed to get my wife out of it, as my attorneys advised me to do.   Mr. Ed. Harber was my attorney in that transaction.   John P. Butler was my wife's attorney.   In pursuance of this settlement I paid my wife something over $700—procured the money from Shanklin & Austin at the bank—procured it on my check—an over-draft.   I can not recall any special conversation I had with Mr. W. E. Austin about the matter, but we talked the matter all over at the time.   I advised with Mr. Austin the same as I did with my attorneys as to what I should do.   This deed was fixed up between Mr. Butler, Mr. Clark, and Mr. Harber.   I am not sure where it was signed, at the hotel or at the house where we were living.   Mr. Clark went up and took the acknowledgment and turned the deeds over to me, and I took them to my father at the

farm; I think it was the same day.  I gave them to my father; he looked at them for awhile, handed them back to me and told me to take them.  I brought them back and put them in my case at the bank; I put them where father told me to; he knew I had a good case there, had it there and kept papers in it.  I do not recollect whether I had any conversation with Mr. Austin after deeds were deposited or not, but I talked with him before the deeds were executed.  I do not recollect exactly what we said, but I and Mr. Austin talked it over and advised about the matter, and he told me I could have the money to pay her.  I told Mr. Austin I was going to make the deed to my father. I don't recollect just what was said.  I recollect in a general way that it was the understanding to make the deed that way, and also that the advice of the attorneys agreed generally. . . .  The deeds remained in the bank from the time I put them there until they were taken out for record.  I did not know why they were not recorded at the time they were executed.  I just left the deed in the vault for safe keeping, just as my father told me to leave it.  There was no one present when I gave my father the deed but my mother. I can't remember the time of day.  They were standing at the south side of the house, near the well; I stood in front of my father, my mother stood on his right.  There were probably some other members of the family about the place, but none near us.  I returned to town the same or next day.  I think that I deposited them when I got back next day."

It appears from the foregoing that the crucial question in the case upon the issues presented in the pleadings, was whether the deeds in question had been delivered to John A. McCracken; and with the evidence thereon conflicting, as shown.  The defendants called Catherine McCracken, widow of John A. McCracken,

deceased, who being sworn as a witness, they offered to prove by her "that she was present at home and at the well at the time mentioned by the witness James McCracken in his testimony; that she saw James McCracken hand to her husband a package of papers folded; that her husband opened it and that she saw they were deeds of some description; didn't read them, and that he handed them back to James McCracken, and she didn't read them." Which evidence was rejected by the court on the ground that she was an incompetent witness for that purpose, and this action of the court presents the material question to be decided on this appeal.

1. By the common law husband and wife were disqualified to testify to facts learned from each other while that confidential relation existed. *Moore v. Wingate*, 53 Mo. 398. By the last clause of section 8922, Revised Statutes 1889, that disability of the wife is expressly continued in all cases as to "any admission or conversation of her husband, whether made to herself or to third parties." It certainly can not be maintained that the evidence offered in this case comes within the express terms of this statute, and we do not think that any of the adjudicated cases are authority for holding that this evidence is within the letter or spirit of its inhibition. In the case cited, the court, in holding the evidence of the wife inadmissible in that case, said: "The witness could not testify to the facts proposed to be proved, without stating what her husband had said. She could not state what agreement was made by her husband with defendant without stating what he had said, and how could she tell whether he claimed the land, unless she learned it from him. The evidence attempted to be elicited by the defendant having been stated in a negative form, can make no difference. No intelligent answer could be made by her

unless she stated facts learned from her husband. This kind of evidence by a wife is excluded on the ground of public policy, and is necessary to preserve the harmony of the marriage relation." In *Willis v. Gammill*, 67 Mo. 730, it was simply held that a widow is not a competent witness to prove an agreement made by her deceased husband. In *Holman v. Bachus*, 73 Mo. 49, it was ruled that Mrs. Jones was not a competent witness, the court saying: "Even if competent to testify to the single act of payment of a sum of money to her husband, accompanied with no conversation, which we do not determine here, that act was connected with a conversation respecting it, and as the statute expressly prohibits her from testifying to that conversation, she can not, on general principles, testify to the act which that conversation might explain and attach a significance to, very different from its import without such explanation."

In *McFadin v. Catron*, 120 Mo. 252, the court ruled that "The evidence of Mrs. McFadin in regard to a conversation between her husband and James Henry as to what was said by them in that conversation was improperly admitted in evidence," adding *arguendo:* "The wife is not a competent witness to prove what is said in a conversation by another person with her husband, nor to prove any act done in connection with such conversation and which might be explained thereby"—citing, *Holman v. Bachus* and *Moore v. Wingate, supra.*

In *Harlan v. Moore*, 132 Mo. 483, it was urged as error that the trial court permitted plaintiff to testify to declarations of her husband made while the marital relation existed, to which the court replied: "The record shows that plaintiff, while testifying as a witness, was asked as to certain declarations of her husband. Upon objection by defendant's counsel, the

court ruled that 'his acts—what he did—may be shown, not what he said.' This ruling answers the objection." These are all the cases that have come under our notice ruling directly upon the point in question, and it will be observed that in all of them the ground upon which the evidence was rejected was that it was evidence clearly coming within the definition of "admissions or conversations of the husband" and even when it is suggested in argument that the acts of the husband might be excluded, it is only upon the postulate that such acts are so connected with a conversation that they might be explained, and the significance thereof be pointed thereby. The evidence offered in this case clearly does not come within the rule of exclusion laid down in any of these cases. The evidence offered was simply an act of the husband unconnected with any "admission or conversation" with him, a knowledge of which the witness derived not from her husband, but from the exercise of her own sense of sight, and we think the court committed error in rejecting it.

That the error was a prejudicial one, for which the judgment should be reversed, is evident upon the face of the statement. All the evidence tends to show, so far as the parties to this suit are concerned, that the deeds were made for a valuable consideration, with the intention on the part of the grantor to protect, rather than to cheat or defraud his creditors, and that the creditor in whose shoes the plaintiff stands, knew all about the transaction and consented thereto. The vital question in the case is, were the deeds delivered, and upon this issue the defendants were entitled to have all the legitimate evidence they offered considered; for upon it hinge the rights of both parties. If determined in the negative, after such consideration, of course the result will be the same. If determined in the affirmative, then the question will arise, for what

purpose were they executed? and a proper solution of this question will determine the equities of the parties. That such a determination of the case may be had, the judgment is reversed and the cause remanded for rehearing.   All concur except BURGESS, J., not sitting.