SARAH LYNN, Administratrix, et al. v. LILLIE HOCKADAY, Appellant.

### Division One, April 16, 1901.

1. **Witnesses: MARRIED WOMEN: STATUTE.** The proviso of the statute concerning a married woman as a witness in a case in which her husband's contract is involved, is an enabling rather than a disabling statute. The proviso applies as well to a case in which her husband's estate is interested as to one in which he is a party. That proviso only dealt with her existing common law disabilities; it did not impose any new disqualification on the wife; if she is not disqualified at common law she was not disqualified by the statute.

2. ———: ———: **DISTRIBUTEES: ADOPTED CHILD.** In a contest as to who are the legal distributees of her husband's estate, a married woman is a competent witness to prove a contract by which her husband adopted defendant as his child. His estate is not augmented or diminished by the result of such a controversy; it simply decides whether or not defendant is a distributee.

3. **Adopted Child: CONTRACT: STATUTE OF FRAUDS: PERFORMANCE.** The adoption of a child need not of necessity be in writing. The law will not allow one of the parties, to an oral contract to adopt, to work an irreparable wrong to one who has fully performed his part of the contract. An agreement by a husband and wife with the grandmother of an orphan child to keep such child as their own, and the giving of the child to them on the faith of that agreement, the immediate change of her name to that of their own, the hiding from her of her real name and identity until she was seventeen years old, and the full performance on their part in the keeping and caring for such child, and the performance by the child of her share as their daughter, is in every respect an executed deed of

adoption, except it lacks formal execution. Being a contract performed, it entitles the adopted child to share as a distributee in the husband's estate.

4. ———: ———: CONSIDERATION. The law regards the fact that the adopted child takes the place of a daughter in the lives of her adopted parents, as a sufficient consideration to support the contract of adoption.

Appeal from Cass Circuit Court.—*Hon. W. W. Wood,* Judge.

REVERSED AND REMANDED (*with directions*).

*Wallace & Wallace* and *Charles W. Sloan* for appellant.

(1) Where parol agreement is made to adopt a child and the child in good faith carries out the agreement by part performance, the contract is valid, and will be specifically enforced in equity. Sharkey v. McDermott, 91 Mo. 647; Healey v. Simpson, 113 Mo. 340; Teats v. Flanders, 118 Mo. 660; Nowack v. Berger, 133 Mo. 24; Davis v. Hendricks, 99 Mo. 478; Van Dyne v. Vreeland, 11 N. J. Eq. 370, 12 N. J. Eq. 142; Wright v. Wright, 99 Mich. 170, 58 N. W. 54; Carmichael v. Carmichael, 72 Mich. 70; Shahan v. Swan (Ohio), 26 N. E. 222. (2) An intended contract of adoption, ineffectual as such by reason of some formal omission required by law, may generate an estoppel when a manifest fraud would result from treating the contract as void. Sutton v. Hayden, 62 Mo. 101; Healey v. Simpson, 113 Mo. 340; Gupton v. Gupton, 47 Mo. 37; Van Dyne v. Vreeland, 11 N. J. Eq. 370. (3) An agreement to adopt a child is taken out of the statute of frauds where the child has been taken and performs for a number of years his part by rendering obedience to the adopted parents and by being maintained by them as a child. Fuchs v. Fuchs, 48 Mo. App. 18; West v. Bundy, 78 Mo. 407; Ander-

son v. Shockley, 82 Mo. 250. (4) After having been taken for adoption by James Lynn, treated and held out to the world as his child, having her name changed and called his daughter and led to believe, as she was during all the years of her childhood, that she was his natural child and possessed of heritable blood, Lynn estopped himself from claiming to the contrary. Reinders v. Koppelmann, 68 Mo. 482, 94 Mo. 338; Sharkey v. McDermott, 91 Mo. 647; Foshburg v. Rogers, 114 Mo. 122; Moran v. Stewart 122 Mo. 295; Wright v. Wright, 99 Mich. 170. (5) Mrs. Lynn was competent as a witness to prove acts and conduct of James Lynn in making the agreement with Susan Cook when the child was taken. Magee v. Burch, 108 Mo. 336; State v. Gabriel, 88 Mo. 639, 640; Henry v. Sneed, 99 Mo. 407; Moeckel v. Heim, 132 Mo. 576; Shanklin v. McCracken, 140 Mo. 348; 1 Greenleaf (14 Ed.), sec. 348; Darrier v. Darrier, 58 Mo. 222; Cramer v. Hunt, 154 Mo. 112. (6) Plaintiff by his cross-examination of witness Lou A. Lynn and offering her letter to Thos. Collins—this being a matter not brought out in chief—thereby rendered her a witness competent to speak as to the original agreement made by her husband with Mrs. Cook as well as for all purposes. Hume v. Hopkins, 140 Mo. 75; Borgess Inv. v. Vettie, 142 Mo. 571; Nichols v. Nichols, 147 Mo. 408.

*Noah M. Givan* and *Allen Glenn* for respondents.

(1) The statute providing the manner of adopting children (section 5246, Revised Statutes of 1899) has been the same since 1875. By the statute of frauds (section 3418, Revised Statutes of 1899), which has been the same since 1875, such contracts must be in writing. (2) To take such contracts, as claimed by appellant, out of the statute of frauds, there must not only be a contract established, clear and unequivocal, but

the court must be well satisfied of the existence and character of the agreement. Acts done by a person seeking to take the contract out of the statute, should be proven clearly, definitely, and referable exclusively to the contract, as well as establish the contract by competent proofs to be clear, definite and unequivocal in all its terms. Rogers v. Wolf, 104 Mo. 9; Brownlee v. Fenwick, 103 Mo. 427; Cherbonnier v. Cherbonnier, 108 Mo. 263; Emmel v. Hayes, 102 Mo. 195; Alexander v. Alexander, 150 Mo. 597. (3) Adoption of children is in derogation of the common law, and of purely statutory enactment, and should be strictly complied with. Sarazin v. Railroad, 153 Mo. 485. (4) The law presumes in favor of the usual and ordinary methods of doing business. White v. Ingram, 110 Mo. 481; Fitzgerald v. Barker, 85 Mo. 13. (5) This presumption can only be overcome by appellant, by proofs clear, definite, conclusive, preponderating, direct, so as to leave no room for reasonable doubt of the contract and all its terms. Berry v. Hartsell, 91 Mo. 136; Johnson v. Quarles, 46 Mo. 423; Burdette v. May, 100 Mo. 17; Sitton v. Shipp, 65 Mo. 297. (6) Loose declarations of persons, since deceased, as to oral contracts, like one claimed by appellant, should be received with great caution, and must be strong, clear and unequivocal, if relied on. Carney v. Carney, 95 Mo. 359; Westerman v. Schmidt, 80 Mo. App. 348; Teats v. Flanders, 118 Mo. 669; Davis v. Green, 102 Mo. 171. (7) Appellant, Lilly Hockaday, was an incompetent witness and was properly excluded. Sec. 4652, R. S. 1899; Sec. 8918, R. S. 1889; Teats v. Flanders, 118 Mo. 670; Wade v. Hardy, 75 Mo. 394. (8) Lou A. Lynn, widow of James Lynn, deceased, is an incompetent witness for the evidence sought from her. Sec. 4656, R. S. 1899; Hollman v. Bachus, 73 Mo. 50; McFadin v. Catron, 120 Mo. 253; Shanklin v. McCracken, 140 Mo. 356;

Willis v. Gammell, 67 Mo. 731; Herndon v. Triple Alliance, 45 Mo. App. 430.

VALLIANT, J.—This suit was for the admeasurement of dower of the widow of James Lynn, intestate, in which his son, James F. Lynn, claimed to be the only heir, but by leave, Lillie Hockaday was made a party and filed an answer and cross-bill showing that she was in fact the adopted daughter of the intestate, although no deed of adoption had been executed, and claiming a child's share in the estate. Issue was joined on the case made in her cross-bill and upon the trial by the court there was a finding and decree against her, from which decree this appeal is taken.

The testimony on behalf of Lillie Hockaday showed that in 1875 she was an infant between three and four years old, her name was then Julia Pettie, both of her parents were dead, and she was left to the care of her maternal grandmother who was old and in poor circumstances, being herself dependent on her son for maintenance. She was the youngest of several children, who, at the death of their parents without any estate, were left dependent on relatives who were unable to provide comfortably for them.

At that time, James Lynn was a farmer in good circumstances living on his farm with his wife, the widow in this case. They had been married about five years and had no child, but he had a son by a former marriage, James F. Lynn, who was the original plaintiff in this case, but who has died since the trial of the suit, and his heirs and administratrix have been substituted as parties.

Mr. and Mrs. Lynn, hearing of the little orphan, went together to the grandmother, who lived about eight miles from them, to see the child and learn if the grandmother would give her to them. That was in March or April, 1875, and for just

what was said between the parties interested on that visit we have to depend upon the memory of Mrs. Lynn and Mrs. William Cook, an aunt of the child's, the grandmother and Mr. Lynn, the real parties to the alleged contract, both being dead.

When Mrs. Lynn was offered as a witness, the plaintiff objected on the ground that she had been the wife of James Lynn, and for that reason was incompetent to testify in the case. The court overruled that objection, but on further objection, ruled that she would not be allowed to testify to conversations with her husband when they were alone. Her testimony as to the agreement was that when they went to see the grandmother they had a talk with her about the child, in which the grandmother told them that the child's mother on her deathbed had given the child to her, and that she was very dear to her, but to get the child a good home she would make a sacrifice of her own feelings; she said that she had had two or three opportunities to give her to parties to raise, but that was not what she wanted; she wanted some one to take the child and raise her for their own child, and where there were no other children. On these terms she would let her go. Mr. and Mrs. Lynn did not decide then to take her, but went home and considered the matter for several days, and after so considering it returned together to the grandmother, who gave the child to them, and they brought her home. Under the ruling of the court this witness was not permitted to testify as to what her husband said to her on the subject. She was asked: "Q. When you were talking to Mrs. Cook (the grandmother) what did she say and how did she say she wanted a person to take her? A. Take her for their own child; to adopt her. Q. That is what she said herself? A. Yes, sir. Q. Did you all agree to that? A. Yes, sir; we agreed to it."

Upon cross-examination plaintiff showed this witness a letter which she acknowledged to have written, and which was

addressed to one of plaintiff's witnesses, Thomas Collins, asking him what he knew about the case, and soliciting his interest in behalf of the adopted child, appealing to him as an old friend of the family, etc. In the letter, she said, "You were the one who told us about the child. Advised us to take her and sent us to grandma Cook's to see about it, which we did. Was pleased with the little child, and took her as our own. Mr. Lynn agreed to take her, adopt her as our own, as fairly as he ever did anything in his life. We were busy that summer and did not attend to having it recorded just then."

Mrs. William Cook was present when Mr. and Mrs. Lynn came to take the child, and she undertook to testify as to the agreement. But though she seemed to be an intelligent woman, she became confused in endeavoring to give the substance of the conversation, and was unable to understand the technical distinction between giving the substance of the conversation and drawing a conclusion therefrom. When asked to state the conversation she said it was so many years ago she could not remember the words that were used; then when asked to state the substance of the conversation she said that the substance was, the child was to be adopted. Upon motion of plaintiff that was ruled out as the statement of a conclusion. After being plied with like questions several times she seemed to grow a little impatient, for example: "Q. Now can you give the exact conversation, if so, do so? A. No, sir, I can not. Q. What was the substance of the conversation? Mr. Jarrott: State what was said. The Court: Take up what each one said, and tell as near what they said as you can. A. I can not take up anything for I do not remember it, and I am not going to do it either.·..... Q. I want you to give what you know about it; you were there? A. I have told you they were there but I can not tell you any of the conversation; only the agreement." The court ruled that that was a conclusion,

and again told her not to state her conclusion, but to state the substance, to which she replied.   "A.   I told you the run of the substance.   Q.   What was it?   A.   They were to adopt that child."   The court again ruled that that was but a conclusion. There was a good deal of such examination and cross-examintion with the result as above indicated.

When the grandmother gave the child to Mr. and Mrs. Lynn, which was on their second visit, they took her home in their buggy, and, passing through the town of Pleasant Hill, called on Mrs. Shortridge, a friend of theirs.   Mrs. Shortridge testified that when Mr. and Mrs. Lynn came in, Mrs. Lynn said, "See our little girl," and Mr. Lynn said that her grandmother had given her to them to raise as their own child.   When they took her home Mr. and Mrs. Lynn immediately changed the child's name to Lillie Lynn, and thereafter she bore that name and none other until she was married.   She was reared in the family of Mr. and Mrs. Lynn in all respects as if she was their own child, and she herself was taught to believe that they were her own father and mother, and she was never informed to the contrary until she was seventeen or eighteen years old.   She addressed them as papa and mamma and they called her daughter.   A letter from Mr. Lynn to her when she was about thirteen years old was in evidence in which he addressed her as his dear daughter, and referred to Mrs. Lynn as her mother.   She was as a dutiful loving daughter to both of them, and they were as kind and affectionate parents to her.   She was never allowed to see her own brothers and sisters or any of her blood relations or to know that she had any such.   In the home circle, among neighbors, in school, in society, wherever she went, she was known as the daughter of Mr. and Mrs. Lynn and she believed so herself until she was grown.   She was married at home in the presence of both her adopted parents with their approval, and she was married under the name of Lillie Lynn.   There

was never any deed of adoption as the statute in such case provides.

Thomas Collins, a witness for plaintiff, the person to whom the letter of Mrs. Lynn above referred to was addressed, testified that he had known the parents of the child, that they had died very poor, leaving several children who were placed in different homes, and the youngest, Julia, was left with her old grandmother, who the witness had heard, wanted to get a home for her and he tried to find her one and told Mrs. Lynn about her. Mrs. Lynn came to his house and at her request he went with her to the grandmother's. Mr. Lynn was not with them. "Q. You may state in substance what arrangements were made, if any, by Mrs. Lou A. Lynn and Mrs. Susan Cook, about Mrs. Lynn taking Julia Petty at the time that you went with Mrs. Lynn to see Susan Cook in the spring of 1875 ? A. We went there to see the old lady, Mrs. Cook, and she consented to give Mrs. Lynn the girl, Julia Petty; the girl was not in a condition to go home with Mrs. Lynn, and she was to go back in a few days. Q. You may state whether or not anything was said at that time by Mrs. Lynn, about taking Julia Petty to adopt ? A. The adopting part I heard nothing of, but Mrs. Cook gave her the child to keep as her own child. . . . . . . . She said that she wanted to take the child and raise her so that she would never know what her kinsfolk's name was."

The plaintiff's effort was to show that it was Mrs. Lynn, and not Mr. Lynn, who was responsible for taking the child from the grandmother, and to this purpose, in addition to the testimony of Collins, called Mrs. Wear as a witness, who testified in effect that Mrs. Lynn had said: "I went after Lillie and could not get her the first time; the second time I went after her I got her. Mrs. Cook told me when I was there the first time that I could not take her if she cried, but if she did not cry I could take her, and I took some trinkets along with me to please

her, and she took up with me and I brought her home and that is all there is about it." Mrs. Frank Lynn and Mrs. Webster testified to similar conversations with Mrs. Lynn.

There was also testimony received, over the objection of defendent, to the effect that Mr. Lynn in his lifetime at various times, but several years after he had taken the child into his family, had said in casual conversations, when asked about it, that he had not adopted her and was not going to do so; that that was his wife's affair, or words to that effect. But these statements were not made in the presence of the girl or of Mrs. Lynn. After hearing this evidence, the court concluded that it was incompetent and ruled it out.

Mrs. Lynn in her testimony had said that she first heard of the child through Mrs. Buckner who informed her about it; the letter of Mrs. Lynn above mentioned was introduced to contradict her on that point. In the letter she said to Collins that he had first informed her. When shown the letter on cross-examination she testified on that point, "That is a mistake, after I recalled it, he was not the first; we asked him something about it; when I wrote that, I thought he was the first that told us about it; but he was not after I reflected over it a little." She had also testified that she never went to the grandmother's with Collins, but in this she was contradicted by Collins, who testified that he went there with her the first time, and a niece of his testified to the same effect. But whether she first heard of the child through Mrs. Buckner or Mr. Collins, and whether or not she first went to see the grandmother with Collins, the fact that she went twice with her husband and the second time they brought away the child with them, is supported by the testimony of several other witnesses, and is not in conflict with the testimony of Mr. Collins and his niece.

There was no conflict in the testimony as to the status of the child after she was brought into the family.

I.  It is insisted for respondents that the testimony of Mrs. Lynn was incompetent, and the argument is, that without her testimony there was no proof of a contract to adopt.

The objection to her testimony was in two forms, general and specific.  The general objection that she was incompetent to testify at all because she was the widow of the intestate, was overruled, the specific objection that she could not testify to conversations with her husband when they were alone was sustained, and she gave no such evidence.  There were other specific objections to parts of her evidence which were sustained. But the testimony above quoted as to what the grandmother said in regard to the conditions upon which she would give them the child, and that Mr. and Mrs. Lynn agreed to those terms, was introduced without objection, unless it was covered by the general objection, going to the total incompetency of the witness. And the letter of Mrs. Lynn to Collins, in which she said that Mr. Lynn had agreed to adopt the child as fairly as he had ever agreed to anything in his life, was introduced by respondents on cross-examination. At the time Mrs. Lynn was first offered as a witness she had an answer on file in the case in which she had pleaded the adoption of the child by her husband and herself and claimed to be entitled to a child's share of the real estate under section 4523, Revised Statutes 1889, now section 2944, Revised Statutes 1899, which provides that if the husband dies leaving a child or children, the widow, if she has a child by such husband, may at her election take a child's share in lieu of dower.  But in view of the objection to her as a witness, under the advice of counsel, she withdrew that answer and elected to take only her dower.

Passing over the question of whether an adopted child fills the requirement of that statute, we see that by its terms the widow's right to a child's share depends on her election, and that election must be in writing in the form prescribed in the next

succeeding section, which it does not appear from the record was observed. Therefore, when she withdrew her answer, which had claimed a child's share on that account and in open court elected to take only her dower, she had then no interest in the controversy, even if she had ever had. But there was no objection made to her competency as a witness on the ground that she was a party in interest to the contract alleged to have been made by the deceased, but it was only on the ground that she was the wife of the deceased, and the argument in the brief of counsel is that she was disqualified by the terms of the proviso in section 8922, Revised Statutes 1889, now section 4656, Revised Statutes 1899. That section declares that no married woman shall be disqualified as a witness in a civil suit prosecuted in the name of or against her husband in certain cases, and specifies the cases, but this is not one of them. Then it adds: *"Provided,* that nothing in this section shall be construed to authorize or prevent any married woman, while the relation exists, or subsequently, to testify to any admission or conversations of her husband, whether made to herself or to third parties." That proviso by its very terms is only a restriction of the right in that section conferred. The section enables a married woman to testify in certain kinds of cases in which by the common law she was disqualified, but having qualified her as a witness in those cases it adds in effect, that in exercising the right there conferred she is not to speak of what her husband may have said to her or to any one else. It is, on the whole, an enabling and not a disabling statute. [Bates v. Forcht, 89 Mo. 121.] The restriction in the proviso is not on a capacity she had before, but only on the privilege there conferred. At common law, in a suit between strangers in which neither the interest of herself nor that of her husband was affected, she was a competent witness to testify to a conversation between her husband and a third person.

[1 Greenleaf Ev. (16 ed.), secs. 341-2.]    Such a case would not come within the purview of that statute.

In Moore v. Wingate, 53 Mo. 398, 1. c. 409, concerning the proviso now under discussion, it was said: "This provision of the statute was intended to apply to all cases, whether the husband was a party to the action or not." The language is broader there than necessary; it would have been sufficient if it said that the provision applied to the facts of that case. And perhaps all that was there intended was that it applied as well to a case in which her husband or his estate was interested as it did to a case in which he was a party. That it was not intended to construe the statute as imposing a new disqualification on a wife is shown by the words immediately following: "It was intended to leave the disabilities of a married woman, in reference to these matters, just as they were at common law."

In Holman v. Bachus, 73 Mo. 49, a similar broad expression is found, but the same idea prevails through the opinion, that the statute only dealt with existing common-law disabilities. In that case the estate of deceased husband, though not sued, was interested. There is nothing in Willis v. Gammill, 67 Mo. 730, McFadin v. Catron, 120 Mo. 253, or Shanklin v. McCracken, 140 Mo. 356, to which we are referred, contrary to this view. If, therefore, Mrs. Lynn was not disqualified at common law, she was not disqualified by the statute.

In Spradling v. Conway, 51 Mo. 51, it was held that where it was simply a controversy between distributees of the estate, the widow of the intestate was not disqualified at common law, and was a competent witness to testify to what her husband said to third parties. This was followed by our St. Louis Court of Appeals, in an opinion by THOMPSON, J., in Hoyt v. Davis, 30 Mo. App. 309, 1. c. 314, and is in harmony with the reasoning in Garvin v. Williams, 50 Mo. 206.

The case at bar presents no claim against the estate of the deceased; it is simply a question between parties claiming to be heirs at law of the intestate, and affects only the partition of the estate between them; the estate itself is not to be augmented or diminished by the result. Suppose, instead of a question of adoption, it was a question of identification of one claiming to be an heir; could there be any doubt that the widow would be a competent witness? If so, then the court committed no error in overruling the general objection that went to the entire exclusion of the witness. Nor did the court commit error in receiving the testimony that was given by Mrs. Lynn relating to what passed between the grandmother and her husband and herself, even if there had been specific objection to that, which was not the case. All there was of her testimony was to the effect that when she and her husband first went for the child, the grandmother stated the terms on which she would let her go; they returned home to consider the proposition, and in a few days returned and bore the child away. The nearest she came to stating what her husband said, was "we agreed to it," and her testimony would have been in all things as effective if that had been omitted. It was a case in which acts spoke louder than words. All the subsequent acts of Mr. Lynn were not only consistent with the theory of adoption, but were inconsistent with any other theory, and those acts testify to what the agreement was more surely than witnesses who attempt to repeat the substance of conversations which they listened to twenty years before.

To Mrs. Shortridge, Mr. Lynn said, on the day he received the child, and while he was on the way carrying her to his house, that the grandmother had given her to them to raise as their own child. Even Mr. Collins, the chief witness for respondents, said: "The adopting part I heard nothing of, but Mrs. Cook gave her the child to keep as her own child."

When we consider who the old grandmother who dictated the terms was, and her condition in life, we can not expect her to have been posted as to the technical requirements of the statute in regard to adoption, but we see that she did understand the difference between merely giving the child out to service or to rear, and giving her to one who would take her for his own child. Her words were as descriptive of the condition as if she had used the technical word adoption.

II. The main argument in resistance to the claim of adoption, is that the agreement relied on is within the statute of frauds, and there being no deed of adoption, the claim fails. The agreement is not, strictly speaking, within the statute of frauds; that is, it is not embracd within the provisions of the ancient statute of frauds. [Browne on Stat. Frauds, sec. 275-276a; Rodgers on Domestic Rel., sec. 459.] Yet it bears a resemblance to cases within that statute, for the reason that the statute authorizing the adopting of a child provides that it may be done by deed in writing, and indicates no other method. And as there was no common law adoption the argument is that it must be done as the statute requires, or it can not be done at all. But since the statute has made the adoption of a child lawful, the law, for the same reasons that it sometimes enforces oral contracts affecting real estate, will not allow the mere failure of one party to do his duty to work an irreparable wrong to one who has fully performed his part. This court, for that reason, has not only held an oral contract for adoption valid, but has also required fulfillment of a collateral agreement of the adopting parent, to leave the adopted child his estate at his death. [Sharkey v. McDermott, 91 Mo. 647.]

Under the evidence in this case we can not shut out from our minds the conviction that Mr. and Mrs. Lynn both agreed with the grandmother to adopt this child, that on the faith of that agreement the child was given to them, and thus the agree-

ment was performed on the part of the grandmother, and that it has been fully performed on the part of both the adopting parents, and the adopted child, save only the deed has not been executed, and that was through no fault of the child's. The life of that whole family in reference to this child, from the time she was first taken into it until the death of Mr. Lynn, would have to be construed to be a deception and a fraud, if we would give to it the effect that respondents claim for it. It is argued that her relatives were poor and that she has had, in the family of Mr. Lynn, a better home and more refined rearing than she would have had if he had not taken her. That may be; but it does not follow as a legal conclusion that the reward was all on her side or even that it was her gain at all. That she took the place of an only daughter in the lives of Mr. and Mrs. Lynn and performed her part as such, is the cold fact which the law regards as sufficient consideration to support the contract. How much she added to their happiness the law does not undertake to estimate. What her life would have been if it had been left to flow on in the channel that nature had given her, whether happier and better or the contrary, no one can tell. But the evidence shows that by no will of hers, and not primarily for her pleasure, she was taken away from her own relatives and was as completely deprived of the affection that comes from natural family ties as if nature had provided her none. Who can estimate the value of that of which she was deprived? And who can say she was compensated by what she received? Taken at an age when she was too young to know who she was, advantage was taken of her very helplessness in that respect, her mind was obscured to the truth and forced to believe in the fictitious condition. She was taken possession of, mind and body, and moulded as her adopted parents desired. Like a bud that has been cut from its natural stem and grafted into a foreign tree, she grew into

the family and became a part of its very life. Everything that adoption contemplates was accomplished. It became a contract fully performed on her part and the statute of frauds can not be invoked to her injury.

The judgment of the circuit court is reversed, and the cause remanded to the court with directions to enter a decree upon the issues made by the cross-bill, declaring Lillie Hockaday a duly adopted child and heir at law of James Lynn, deceased, and as such entitled to a child's share of his estate.

All concur, except *Marshall, J.*, absent.